**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NORTHEASTERN | : | CIVIL ACTION  - LAW |
| PENNSYLVANIA FREETHOUGHT | : | |
| SOCIETY, | : | |
| Plaintiff | : | |
| | : | |
| | : | ELECTRONICALLY FILED |
| vs. | : | |
| | : | |
| COUNTY OF LACKAWANNA | : | |
| TRANSIT SYSTEM | : | 3:15-CV-00833 |
| | : | |
| Defendant | : | |

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I.    PROCEDURAL HISTORY

On April 28, 2015, the Plaintiffs filed a Complaint in this matter alleging violations of the Free Speech Clause of the First Amendment of the United States Constitution.  *See* Document #1. A motion to dismiss was filed on June 25, 2015. *See* Document number 6.  The Court denied the motion to dismiss via an order dated January 27, 2016.  *See* Document number 20.  The Defendant now moves for Summary Judgment.

## II.    FACTS

*See* Defendants' Statement of Material Facts.

### III.   QUESTIONS PRESENTED

1.     Are Defendants entitled to summary judgment on Plaintiff's First
       Amendment claim?

       Suggested Answer:  Yes.

### IV.  STANDARD OF REVIEW

Summary judgment should be granted when the pleadings, depositions,

answers to interrogatories, admissions on file, and affidavits show that there is no

genuine issues as to any material fact and that the moving party is entitled to

judgment as a matter of law.  Fed. R.Civ.P. 56(c).  Initially, the moving party must

show the absence of a genuine issue concerning any material fact.  *See* Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has satisfied its

burden, the non-moving party, "must present affirmative evidence in order to

defeat a properly supported motion for summary judgment."  Anderson, 477 U.S.

at 257; *see* Celotex Corp., 477 U.S. at 323-324.  Neither unsworn statements of

counsel in memoranda submitted to the Court, nor unsupported conclusory

allegations in the pleadings will dispute a material fact.  *See* Fed. R.Civ. P. 56(e),

Schoch v. First Fid. Bancorp., 912 F.2d 654, 657 (3d Cir. 1990). Third Circuit

stated in Lauren W. v. DeFlaminis, 480 F.3d 259, 272 (3d Cir. 2007), "[t]he fact is

that in considering a motion for summary judgment the court should believe

uncontradicted testimony unless it is inherently implausible even if the testimony is

that of an interested witness." "A party resisting a [Rule 56] motion cannot expect

2

to rely merely upon bare assertions, conclusory allegations or suspicions." <u>Gans v.</u>

<u>Mundy</u>, 762 F.2d 338, 341 (3d Cir. 1985)(*citing* <u>Ness v. Marshall</u>, 660 F.2d 517,

519 (3d Cir. 1981)). The party opposing summary judgment "must do more than

simply show that there is some metaphysical doubt as to the material facts."

<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586, 89 L. Ed. 2d

538, 106 S. Ct. 1348 (1986). The nonmovant must "point to concrete evidence in

the record that supports each and every essential element in his case." <u>Orsatti v.</u>

<u>New Jersey State Police</u>, 71 F.3d 480, 484 (3d Cir. 1995).  To withstand

defendants' motion, plaintiff must come forward with more than his own

unsupported beliefs. *See* <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256-57

(1986).

## V.    LAW AND ARGUMENT

### A.    Plaintiff's Complaint must be dismissed as they have failed to produce evidence to establish a First Amendment Violation

#### i.    COLTS' advertising spaces are a nonpublic forum

The government may, as a general rule, limit speech that takes place on its

own property without running afoul of the First Amendment. <u>Lamb's Chapel v.</u>

<u>Center Moriches Union Free School Dist.</u>, 508 U.S. 384, 390, 124 L. Ed. 2d 352,

113 S. Ct. 2141 (1993); <u>Perry Educ. Ass'n. v. Perry Local Educators' Ass'n</u>, 460

U.S. 37, 46, 74 L. Ed. 2d 794, 103 S. Ct. 948 (1983). Where, however, the property

in question is either a traditional public forum or a forum designated as public by

the government, the government's ability to limit speech is impinged upon by the First Amendment. Perry, 460 U.S. at 45-46. In either a traditional or a designated public forum, the government's content-based restrictions on private speech must survive strict scrutiny to pass constitutional muster. Id.; International Society for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 678, 120 L. Ed. 2d 541, 112 S. Ct. 2701 (1992).

The government has, however, a far broader license to curtail speech if the forum has not been opened to the type of expression in question. In such a case, the government's restrictions need only be viewpoint neutral and "reasonable in light of the purpose served by the forum." Rosenberger v. Rector and Visitors of the Univ. of Va., 515 U.S. 819, 115 S. Ct. 2510, 2516-2517, 132 L. Ed. 2d 700 (1995) (quoting Cornelius v. NAACP Legal Defense and Educ. Fund, Inc., 473 U.S. 788, 806, 87 L. Ed. 2d 567, 105 S. Ct. 3439 (1985)); Kreimer v. Bureau of Police for the Town of Morristown, 958 F.2d 1242, 1262 (3d Cir. 1992).

In order to decide whether a public forum is involved here, we must first determine the nature of the property and the extent of its use for speech. As the Court noted in Pittsburgh League of Young Voters Education Fund v. Port Authority of Allegheny County, 653 F.3d 290 (3d Cir 2011):

> The government does not have "to grant access to all who wish to exercise their right to free speech on every type of [public] property without regard to the nature of the property or to the disruption that might be caused by the

4

speaker's activities." Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 799-800, 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985). The Supreme Court has developed a forum analysis to determine when the government's interest in limiting the use of its property outweighs the interest of those wishing to use the property as a place for expressive activity. Id.

There are three types of fora. Christian Legal Soc'y v. Martinez, 130 S. Ct. 2971, 2984 n.11, 177 L. Ed. 2d 838 (2010). On one end of the spectrum lie traditional public fora. These fora, of which public streets and parks are examples, "'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S. Ct. 948, 74 L. Ed. 2d 794 (1983) (quoting Hague v. CIO, 307 U.S. 496, 515, 59 S. Ct. 954, 83 L. Ed. 1423 (1939)). In traditional public fora, content-based restrictions on speech are subject to strict scrutiny (i.e., the restrictions must be narrowly tailored to serve a compelling governmental interest). Id. Next are designated public fora. These fora consist of public property "that has not traditionally been regarded as a public forum" but that the government has intentionally opened up for use by the public as a place for expressive activity. Pleasant Grove City v. Summum, 555 U.S. 460, 129 S. Ct. 1125, 1132, 172 L. Ed. 2d 853 (2009). As is the case in traditional public fora, content-based restrictions are subject to strict scrutiny in designated public fora. Perry, 460 U.S. at 45. Finally, public property that "is not by tradition or designation a forum for public communication" constitutes a nonpublic forum. Id. at 46. Access to a nonpublic forum can be restricted so long as the restrictions are reasonable and viewpoint neutral. Cornelius, 473 U.S. at 800.

The forum at issue here is COLTS advertising space on its buses. *See* Airline Pilots Assoc. v. Dept. of Aviation of the City of Chicago, 45 F.3d 1144, 1151 (7th Cir. 1995) (holding that display diorama in airport, not entire concourse, constituted relevant forum); Lebron v. Nat'l. R.R. Passenger Corp., 69 F.3d 650, 655-656 (holding that one billboard was the relevant forum, not the entire Penn Station).

Clearly, the advertising space on COLTS buses do not constitute a "traditional" public forum.   Traditional public forums include public streets, parks, and other public areas traditionally devoted to assembly and debate. *See* Ark. Educ. Television Comm'n v. Forbes, 523 U.S. 666, 677, 118 S.Ct. 1633, 1641, 140 L. Ed. 2d 875 (1998).

The facts also fail to establish that COLTS created a designated public forum.  A party creates a designated public forum when it intentionally designates property that traditionally has not been regarded as a public forum for use as a public forum. Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of Law v. Martinez, 130 S.Ct. 2971, 2984 n.11, 177 L. Ed. 2d 838 (2010). The question is whether COLTS has created a designated public forum by "expressly" dedicating its advertising space to "speech activity." U.S. v. Kokinda, 497 U.S. 720, 726-727, 111 L. Ed. 2d 571, 110 S. Ct. 3115 (1990) (plurality opinion). A designated public forum is created because the government so intends. Inaction

does not make such a forum; neither does the allowance of "limited discourse."
Cornelius, 473 U.S. at 802. The Court must look to the COLTS' intent with regard
to the forum in question and ask whether they clearly and deliberately opened its
advertising space to the public. Hazelwood School Dist. v. Kuhlmeier, 484 U.S.
260, 269- 270, 98 L. Ed. 2d  592, 108 S. Ct. 562 (1988); Perry, 460 U.S. at 37.

To gauge COLTS' intent, the Court must examine its policies and practices
in using the space and also the nature of the property and its compatibility with
expressive activity. Gregoire v. Centennial School District, 907 F.2d 1366, 1371
(3d Cir. 1990) (citing Cornelius, 473 U.S. at 802); Brody v. Spang, 957 F.2d 1108,
1117 (3d Cir. 1992).  Courts must rely on several factors to gauge the government's
intent. Cornelius, 473 U.S. at 802. They look first to the terms of any policy the
government has adopted to govern access to the forum. Id. If the government
requires speakers seeking access to obtain permission, under pre-established
guidelines that impose speaker-based or subject-matter limitations, the government
generally intends to create a limited, rather than a designated, public forum.
Forbes, 523 U.S. at 679-80; Cornelius, 473 U.S. at 804; Perry, 460 U.S. at 47.
Granting selective access in that fashion negates any suggestion that the
government intends to open its property to the "indiscriminate use by all or part of
the general public" necessary to create a designated public forum. Hills v.

Scottsdale Unified Sch. Dist., 329 F.3d 1044, 1050 (9th Cir. 2003) (per curiam);

*see also* Forbes, 523 U.S. at 679; Perry, 460 U.S. at 47.

COLTS' policy provides that "it is COLTS' declared intent not to allow its

transit vehicles or property to become a public forum for dissemination, debate or

discussion of public issues." *See* Exhibit A; D; I.  Discovery in this matter has

failed to uncover any evidence to establish that COLTS has ever opened its

advertising space to create anything other than a non-public forum.  Prior to the

enactment of COLTS first advertising policy on June 21, 2011, COLTS rejected an

advertisement regarding judgment day because it was religious in nature.  *See* the

Deposition of Gretchen Wintermantel, Exhibit G, at 30-32.  After the adoption of

the policy in 2011, COLTS continued to reject advertisements, including

advertisements from Northeast Firearms, Wilkes Barre-Scranton Night Out, and

the NEPA Freethought Society.  Id. at 38, 52, 77, 85, 104; Exhibit C and E. At no

time since the enactment of the original advertising policy in June, 2011 has

COLTS accepted any ads on its buses which were pro-religion or anti-religion. *See*

the Affidavit of J. Timothy Hinton, Esquire, Exhibit I.

A new policy was enacted on September 17, 2013. *See* Exhibit D.  This was

created to clarify the old policy and incorporate changes suggested by Plaintiff's

counsel in this matter.  *See* Deposition of Gretchen Wintermantel, Exhibit G at 94;

Affidavit of J. Timothy Hinton, Esquire, Exhibit I.  Since the enactment of the new

policy in 2013, no advertisements have been run which violate the policy.  *See* Deposition of Gretchen Wintermantel, Exhibit G at 98; Deposition of Justin Vacula, Exhibit F at 84-85; Affidavit of J. Timothy Hinton, Esquire, Exhibit I.

The evidence in this matter fails to establish that COLTS intended to create anything but non public forum or limited public forum, open only to certain kinds of expression. *See, e.g.*, Kreimer, 958 F.2d at 1261 (public library constituted a limited public forum for "reading, writing and quiet contemplation," but not for "oral and interactive" First Amendment activities); Rosenberger v. Rector and Visitors of the Univ. of Va., 515 U.S. 819, 115 S. Ct. 2510, 2517, 132 L. Ed. 2d 700 (1995) (student activities fund, available to student groups meeting certain criteria, constituted limited public forum); *See also*, Ridley v. Massachusetts Bay Transportation Authority, 390 F.3d 65 (1st Cir. 2004) (an entity that allowed a wider range of speech than was permitted in Lehman is not automatically stripped of its ability to adopt other viewpoint-neutral criteria for selecting content that reasonably served  the agency's overriding commercial purpose);  *See also*, Seattle Mideast Awareness Campaign v. King County, 781 F.3d 489 (9th Cir. 2015)(the fact that a transit system runs some controversial ads does not mean that its advertising program becomes a designated public forum).

The Supreme Court has  used the term "limited public forum" interchangeably with "nonpublic forum," thus suggesting that these categories of

forums are the same. *See* Martinez, 130 S.Ct. at 2985 (citing Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 49, 103 S.Ct. 948, 957, 74 L. Ed. 2d 794 (1983)); Good News Club v. Milford Cent. Sch., 533 U.S. 98, 106, 121 S.Ct. 2093, 2100, 150 L. Ed. 2d 151 (2001). The First Amendment prohibits restrictions based on a speaker's viewpoint in both types of forums. Id.  In contrast to traditional and designated public forums, a governmental entity creates a limited public forum when it provides for "a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects." Id.; Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd., 336 F.3d 211, 225 (3d Cir. 2003).

To the extent Plaintiff argues that advertisements which were posted prior to the enactment of the policy in 2011 somehow preclude COLTS from enacting the policy, both Christ's Bride Ministries, Inc. v. Southeastern Pennsylvania Transportation Authority, 148 F.3d 242 (3d. Cir 1998) and Pittsburgh League of Young Voters Educ. Fund, 653 F.3d 290, 296 (3d Cir. 2011), stand for the proposition that past practice regarding advertising is not alone sufficient to establish that an advertising space is a designated public forum.  Furthermore, both cases stand for the proposition that if a forum was a designated public forum prior to adopting a new policy, a government entity is permitted to close such a forum. Therefore, to the extent Plaintiff argues that the buses were a designated public forum before the enactment of COLTS' policy, the forum was closed by COLTS

enactment of a policy in 2011 and again in 2013. The uncontroverted evidence is that COLTS advertising space has been a non public forum.  Furthermore, it is uncontroverted that it has been a non public forum since June 21, 2011, which predates the Plaintiff's first submission of an advertisement.  As such, the COLTS advertising spaces must be treated as a non public or limited public forum.

ii.   **The restrictions placed upon COLTS advertising space are viewpoint-neutral and reasonable in light of the purpose served by the forum**

COLTS' advertising policy provides that "COLTS has decided to sell space for advertising on its vehicles, route schedules and other literature, bus shelters or other property, for the sole purpose of generating revenue for COLTS while at the same time maintaining or increasing its ridership." *See* Exhibit D. The Policy also provides that "It is COLTS' declared intent to maintain its advertising space on its property as a nonpublic forum and not to allow transit vehicles or property to become a public forum for the dissemination, debate, or discussion of public issues that are political or religious in nature. " Id.  That was also the intent when it was drafted in 2011, and revised in 2013.  *See* Affidavit of Tim Hinton, Esquire, Exhibit I.

In Eichenlaub v. Township of Indiana, 385 F.3d 274 (3d Cir. 2004), the Court addressed restrictions on speech in a limited public forum. There we held that the citizens' forum portion of the Indiana Township Board of Supervisors meeting was a limited public forum because "public bodies may confine their

11

meetings to specified subject matter . . . matters presented at a citizen's forum may be limited to issues germane to town government." Id. at 281 (citations and internal quotation marks omitted). In limited public forums, to avoid infringing on First Amendment  rights, the governmental regulation of speech only need be viewpoint-neutral and "reasonable in light of the purpose served by the forum[.]" Good News Club v. Milford Cent. Sch., 533 U.S. 98, 107, 121 S.Ct. 2093, 2100, 150 L. Ed. 2d 151 (2001) (citation and internal quotation marks omitted).

In a limited public forum "content-based restraints are permitted, so long as they are designed to confine the forum to the limited and legitimate purposes for which it was created." Eichenlaub, 385 F.3d at 280 (internal quotation marks and citation omitted). The government may not "regulat[e] speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." Rosenberger v. Rector and Visitors of the Univ. of Va., 515 U.S. 819, 829, 115 S.Ct. 2510, 2516, 132 L. Ed. 2d 700 (1995). The government, however, may restrict the time, place and manner of speech, as long as those restrictions are reasonable and serve the purpose for which the government created the limited public forum. Pleasant Grove, 129 S.Ct. at 1132.

In Lehman v. City of Shaker Heights, 418 U.S. 298, 41 L. Ed. 2d 770, 94 S. Ct. 2714 (1974), the Court addressed a similar issue.  In Lehman, the city imposed a ban on political advertisements in buses, but allowed other types of

advertisements, including commercial and public service ads. A candidate for

public office challenged this policy as a First Amendment violation, and the Court

responded as follows:

> Here, we have no open spaces, no meeting hall, park,
> street corner, or other public thoroughfare. Instead, the
> city is engaged in commerce. It must provide rapid,
> convenient, pleasant, and inexpensive service to the
> commuters of Shaker Heights. The car card space,
> although incidental to the provision of public
> transportation,  is part of the commercial venture. In
> much the same way that a newspaper or periodical, or
> even a radio or television station, need not accept every
> proffer of advertising from the general public, a city
> transit system has discretion to develop and make
> reasonable choices concerning the type of advertising
> that may be displayed in its vehicles. In making these
> choices, this Court has held that a public utility "will be
> sustained in its protection of activities in public places
> when those activities do not interfere with the general
> public convenience, comfort and safety." Public Utilities
> Comm'n v. Pollak, 343 U.S. [451,] 464-65 [(1952)].
>
> Because state action exists, however, the policies and
> practices governing access to the transit system's
> advertising space must not be arbitrary, capricious, or
> invidious. . . . Revenue earned from long-term
> commercial advertising could be jeopardized by a
> requirement that short-term candidacy or issue-oriented
> advertisements be displayed on car cards. Users would be
> subjected to the blare of political propaganda. There
> could be lurking doubts about favoritism, and sticky
> administrative problems might arise in parceling out
> limited space to eager politicians. In these circumstances,
> the managerial decision to limit car card space to
> innocuous and less controversial commercial and service
> oriented advertising does not rise to the dignity of a First
> Amendment violation. . . . No First Amendment forum is

here to be found. The city consciously has limited access
to its transit system advertising space in order to
minimize chances of abuse, the appearance of favoritism,
and the risk of imposing upon a captive audience. These
are reasonable legislative objectives advanced by the city
in a proprietary capacity. In these circumstances, there is
no First or Fourteenth Amendment violation.

Lehman, 418 U.S. at 303-04 (plurality opinion).

The evidence in this matter establishes that the restrictions of the COLTS'

policy are both content-neutral and reasonable in light of the forum.  COLTS will

not accept advertisements "that promote the existence or non existence of a

supreme deity, deities, being or beings; that address, promote, criticize or attack a

religion or religious beliefs or lack of religious beliefs."  *See* Exhibit D. It was also

COLTS' intent not to make their property "a public forum for the dissemination,

debate, or discussion of public issues or issues that are political or religious in

nature.  Id. ; See also, Exhibit I.

This is clearly not a viewpoint restriction.  A viewpoint restriction "targets

not subject matter, but particular views taken by speakers on a subject."

Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829, 115 S. Ct.

2510, 132 L. Ed. 2d 700 (1995). The government must abstain from regulating

speech when the specific motivating ideology or the opinion or perspective of the

speaker is the rationale for the restriction. *See* Perry Ed. Assn. v. Perry Local

Educators' Assn., 460 U.S. 37, 46, 74 L. Ed. 2d 794, 103 S. Ct. 948 (1983).

COLTS policy placed no such restrictions on speech.

These principles provide the framework forbidding the State from exercising viewpoint discrimination, even when the limited public forum is one of its own creation. In a case involving a school district's provision of school facilities for private uses, the Supreme Court declared that "there is no question that the District, like the private owner of property, may legally preserve the property under its control for the use to which it is dedicated." Lamb's Chapel v. Center Moriches Union Free School Dist., 508 U.S. 384, 390, 124 L. Ed. 2d 352, 113 S. Ct. 2141 (1993). The necessities of confining a forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for certain groups or for the discussion of certain topics. See, e. g., Cornelius v. NAACP Legal Defense & Ed. Fund, Inc., 473 U.S. 788, 806, 87 L. Ed. 2d 567, 105 S. Ct. 3439 (1985); Perry Ed. Assn., supra, at 49. Thus, in determining whether the State is acting to preserve the limits of the forum it has created so that the exclusion of a class of speech is legitimate, we have observed a distinction between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations. See Perry Ed. Assn., supra, at 46. In other words, if the

government allows speech on a certain subject in any forum, it must accept all viewpoints on the subject, even those that it disfavors or finds unpopular. Pittsburgh League of Young Voters Educ., 653 F.3d at 296.  The COLTS policy clearly precludes speech regarding the existence or non-existence of a supreme deity or deities, as well as advertising promoting or attacking a religion.  Because it precludes all advertisements, regardless of their viewpoint on the issue, it is viewpoint neutral.

The restriction is also reasonable.  It must be "reasonable in light of the purpose served by the forum." Cornelius, 473 U.S. at 806. This requirement focuses on whether the exclusion is consistent with "limiting [the] forum to activities compatible with the intended purpose of the property." Perry, 460 U.S. at 49.   The intended purpose of the property at issue here, buses, stops and literature, is to provide safe and reliable public transportation. It is COLTS' intent to not allow its property to become a forum for debate on political or religious issues.  It is also their goal to "a safe and welcoming environment on its buses for the public at large."  Any speech that will foreseeably result in harm to, disruption of, or interference with the transportation system is, by definition, incompatible with the buses' intended purpose. *See* Children of the Rosary v. City of Phoenix, 154 F.3d 972, 979 (9th Cir. 1998). Restrictions on speech that will foreseeably disrupt the intended function of government property have generally been held

reasonable in limited public forums. *See* <u>United States v. Kokinda</u>, 497 U.S. 720,

732—33, 110 S. Ct. 3115, 111 L. Ed. 2d 571 (1990) (plurality opinion); <u>Perry</u>, 460

U.S. at 51—52 & n.12.  COLTS' policy was created because they did not want

their buses to become a forum for debate of public issues.  *See* Deposition of

Gretchen Wintermantel, Exhibit G, at 33-34, 87; Deposition of Robert Fiume,

Exhibit H, at 78; Affidavit of J. Timothy Hinton, Esquire, Exhibit I.  COLTS'

policy was enacted so that they could provide a safe and reliable public

transportation system to the public at large.  <u>Id</u>.

The COLTS policy is both content-neutral and reasonable in light of the

forum.  As such, COLTS is entitled to summary judgment.

**iii.     Plaintiff has failed to produce any evidence to establish viewpoint discrimination**

Plaintiff alleged in the Complaint, *inter alia*, that COLTS unevenly enforced

its policies, accepted every advertisement presented to it prior to the NEPA

Freethought Society advertisement, and failed to enforce its policy in a content

neutral manner.  The facts elicited through discovery contradict each of these

allegations and fail to support a claim of viewpoint discrimination.

Viewpoint discrimination occurs when the government "targets not subject

matter, but particular views taken by speakers on a subject." <u>Rosenberger v. Rector</u>

<u>& Visitors of Univ. of Va.</u>, 515 U.S. 819, 829, 115 S. Ct. 2510, 132 L. Ed. 2d 700

(1995). *See also* <u>Ridley v. Mass. Bay Transp. Auth.</u>, 390 F.3d 65, 82 (1st Cir.

2004) (explaining that the government engages in viewpoint discrimination when it suppresses speech because it disagrees with "the underlying ideology or perspective that the speech expresses"); *See also*, <u>Pittsburgh League of Young Voters Educ. Fund</u>, 653 F.3d 290, 296 (3d Cir. 2011).   The uncontroverted evidence of record establishes that COLTS rejected all advertisements which were religious in nature since the inception of their advertising policy.

Justin Vacula admits that his request to advertise was not in response to advertisements promoting religion.  Vacula testified that he submitted the subject advertisement after seeing God Bless America run on a headsign.  *See* Deposition of Justin Vacula, Exhibit F, at 39, 41.  He complained about the message, and it was removed by COLTS.  <u>Id</u>. He also made a similar complaint about a ribbon, which was also taken down.  <u>Id</u>. at 43-44.  Vacula admitted that once he complained, both items were taken down and he has not seen them again.  <u>Id</u>. at 43, 43-45.  He also agreed that neither was an advertisement.  <u>Id</u>. at 67.  After these items were taken down, he submitted the NEPA Freethought Society advertisement in an effort to challenge the COLTS advertising policy.  <u>Id</u>. at 65-66.

The record evidence fails to establish any evidence that COLTS failed to enforce its policy in a content neutral manner. At no time since December, 2009 have advertisements been placed on COLTS' buses which discuss the existence or non-existence of a supreme deity. *See* Exhibit I.   At no time since the enactment of

the original advertising policy in June, 2011 has COLTS accepted any advertisements on its buses which were pro-religion or anti-religion. Id.; Deposition of Gretchen Wintermantel, Exhibit G, at 98, 141-142.

The uncontroverted evidence is that COLTS policy was evenly enforced and all advertisements of a religious nature were rejected.  There is no evidence to establish that any religious group was permitted to display pro-religious advertisements, or were favored over the NEPA Freethought Society. The COLTS policy was enforced in a consistent and content neutral manner.  As such, COLTS is entitled to summary judgment and Plaintiff's claim of viewpoint discrimination must be dismissed.

## V.      CONCLUSION

There are no  material issues of fact and the Defendant is entitled to judgment as a matter of law.  Plaintiff's Complaint must be dismissed with prejudice.

MARSHALL  DENNEHEY
WARNER COLEMAN & GOGGIN

By:_____
        William J. McPartland, Esquire
        Attorney I.D. No:  PA 94214
        P.O. Box 3118
        Scranton, PA  18505-3118
        (570) 496-4600

19

## <u>L.R. 7.8(b) CERTIFICATE</u>

This brief complies with the Local Rule 7.8(b)  The brief contains 4,624

words.

MARSHALL  DENNEHEY
WARNER COLEMAN & GOGGIN

By:_____
      William J. McPartland, Esquire
      Attorney ID. No:  PA 94214
      P.O. Box 3118
      Scranton, PA  18505-3118
      (570) 496-4600

## CERTIFICATE OF SERVICE

I, William J. McPartland, Esquire, do hereby certify that a true and correct

copy of the foregoing Brief in Support of Their Motion for Summary Judgment was

served upon all parties by electronic mail on the 1st day of August, 2016 at the

following addresses:


Mary Catherine Roper, Esquire
Molly Tack-Hooper, Esquire
American Civil Liberties Union of Pennsylvania
P.O. Box 60173
Philadelphia, PA  19102

Ben Wanger, Esquire
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA  19103-7286


MARSHALL  DENNEHEY
WARNER COLEMAN & GOGGIN

By:_____
       William J. McPartland, Esquire
       Attorney I.D. No:  PA 94214
       P.O. Box 3118
       Scranton, PA  18505-3118
       (570) 496-4600

LEGAL/105985723.v1