**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

NORTHEASTERN PENNSYLVANIA :
FREETHOUGHT SOCIETY,
                             :     **CIVIL ACTION NO. 3:15-0833**

        **Plaintiff**           :        **(JUDGE MANNION)**

            **v.**                  :

**COUNTY OF LACKAWANNA**    :
**TRANSIT SYSTEM,**
                             :

       **Defendant**

## MEMORANDUM

Pending before the court are the cross-motions for summary judgment regarding the plaintiff's civil rights complaint under 42 U.S.C. §1983, (Doc. 1), filed by defendant County of Lackawanna Transit System ("COLTS"), (Doc. 30), and by plaintiff Northeastern Pennsylvania Freethought Society, (Doc. 32). Plaintiff alleges that COLTS' policies regarding advertisements on its buses and its refusal to run ads containing the word "Atheist" violated plaintiff's right to freedom of speech under the First and Fourteenth Amendments. For the reasons that follow, COLTS' motion for summary judgment will be **DENIED** and plaintiff's motion will be **DENIED**.


## I.     PROCEDURAL BACKGROUND

Plaintiff filed a complaint on April 28, 2015, alleging a violation of its First Amendment right to freedom of speech. (Doc. 1). Specifically, Count I of the complaint raises claims under the First and Fourteenth Amendments

pursuant to [42 U.S.C. §1983](#) and alleges that COLTS' advertising policy violates plaintiff's free speech right. Specifically, plaintiff alleges that COLTS' refusal to run its ads with the word "Atheists" in them is an impermissible content and viewpoint based restriction on its rights under the free speech clause of the First Amendment. Plaintiff requests both declaratory and injunctive relief to remedy alleged ongoing violations of its constitutional rights. In particular, plaintiff seeks a declaration that COLTS' rejection of its ads violated the First Amendment and a declaration that COLTS' 2013 policy continues to violate the First Amendment.[1] Plaintiff also seeks a permanent injunction prohibiting COLTS from enforcing its 2013 policy. Further, plaintiff requests costs and attorney's fees under 42 U.S.C. §1988.

On June 25, 2015, COLTS filed a motion to dismiss for failure to state a claim upon which relief may be granted under [Fed. R. Civ. P. 12(b)(6)](#), (Doc. [6](#)), and a brief in support, (Doc. [7](#)). Plaintiff filed its brief in opposition to the motion on July 27, 2015. (Doc. [10](#)). COLTS filed its reply brief on August 10, 2015. (Doc. [11](#)). On January 27, 2016, the court issued a memorandum and order denying COLTS' motion to dismiss. (Doc. [20](#), Doc. [21](#)). *See also* 158 F.Supp.3d 247 (2016).

On February 8, 2016, COLTS filed its answer to the complaint with affirmative defenses. (Doc. [22](#)).

---

[1]Plaintiff cannot seek declaratory relief insofar as it seeks this relief for alleged past constitutional violations. *See* [Blakeney v. Marsico, 340 Fed.Appx. 778, 780 (3d Cir. 2009)](#).

Discovery was then conducted and extensions of time to complete discovery were granted. (Doc. 25, Doc. 29).

On July 18, 2016, COLTS filed a motion for summary judgment and its statement of material facts with exhibits. (Doc. 30, Doc. 31). Also, on July 18, 2016, plaintiff filed a motion for summary judgment and its statement of material facts with exhibits. (Doc. 32, Doc. 33). The parties then fully briefed both motions and responded to each other's statement of material facts. (Doc. 34, Doc. 36, Doc. 39, Doc. 40, Doc. 41, Doc. 44, Doc. 46, Doc. 48, Doc. 52).[2] As such, the cross-motions for summary judgment are ripe for review.

The court has jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1343(a), and venue is proper in this district since the defendant is located here and the claims accrued here.

## II.   STATEMENT OF MATERIAL FACTS[3]

Plaintiff is an unincorporated association, with its principal office in Wilkes-Barre, Pennsylvania. Plaintiff's mission is "to facilitate a social, educational, activist, and philosophical coalition of atheists, agnostics,

---

[2]To the extent an amended brief and an amended response to statements of material facts were submitted, the court only considers the amended filings. Thus, Doc. 35 and Doc. 45 are not considered.

[3]The material facts are derived from the statements filed by the parties, from their respective responses to the opponent's statements, and from the exhibits filed of record. Conclusions of law by the parties in their statements are not included in the material facts. Nor are disputed facts included in the material facts.

humanists, secularists, and skeptics predicated on support and community that upholds the separation of church and state and promotes critical thinking." Justin Vacula is the co-organizer and the spokesperson for plaintiff.[4] Plaintiff advocates for government neutrality in matters of religion and, it has participated in protests involving separation of church and state issues and it seeks to uphold this principle. Plaintiff also has participated in public discussions regrading matters of religion including discussions with religious organizations.

COLTS is a public transportation authority operating under the Municipal Authorities Act of 1945, [53 Pa.C.S. §5607](), and is headquartered in Scranton, Pennsylvania. At all relevant times COLTS acted under color of state law. COLTS' mission is to "provide safe public transportation throughout Lackawanna County."

As of June 2008, Robert Fiume was COLTS' Executive Director and he supervised "the whole transportation system." Fiume delegated to the Advertising Manager and then to the Communications Director, Gretchen Wintermantel, the responsibility to decide whether to accept a proposed advertisement for the buses. Wintermantel started working for COLTS in April 2009. Wintermantel is responsible for deciding whether COLTS accepts an advertisement proposal and interpreting COLTS' advertising policies and, she

---

[4]On May 12, 2016, the court approved a Stipulation indicating that Vacula's deposition would constitute testimony on his own behalf, as well as a corporate designee of plaintiff. (Doc. [27]).

consults with management and the solicitor in making these decisions.

COLTS has had a practice of leasing advertising space on the outside of its buses dating back to 2004. COLTS has made advertising space on its buses available to the public for the purpose of raising revenue and not to further any organizational policy or goal. COLTS' advertising revenue comprises less than 2% of COLTS' yearly revenue.

Prior to 2011, COLTS did not have an advertising policy but it had a sentence in its advertising contract that provided COLTS had the right to reject any ads that it deemed objectionable or controversial. Prior to April 2009, Wintermantel was not aware of any instance in which COLTS rejected a request for an advertisement. However, after she started with COLTS, she rejected a "Judgment Day" ad. Additionally, in 2009, COLTS ran an advertisement for a website called "The Old Forge Times News" which had the URL address for an internet blog that contained links to anti-Semitic websites, holocaust denial websites and white supremacist websites. However, the content of the blog and the links contained in the blog were not visible from the ad. (Doc. 31, Exs. F & G).

COLTS also ran advertisements for the following:

a. a beer distributor called "Brewers Outlet";
b. St. Mary's Byzantine Catholic Church;
c. the Evangelism and Socialism Ministry of St. Matthew's Lutheran Church;
d. Hope Church;
e. the Office of Catholic Schools;
f. the St. Stanislaus School's Polish Food Festival;
g. the Diocese of Scranton's "Adoption for Life" campaign; and

5

h. school board candidate Patrick O'Malley.

COLTS did not receive any complaints about the above advertisements. Prior to adopting the advertising policy in 2011, COLTS never received a complaint about any advertisement than ran on a COLTS bus. Nor was COLTS aware of any disruption on a COLTS bus caused by an advertisement it displayed or caused by any passengers which occurred before COLTS adopted an advertising policy.

COLTS has never placed any restrictions regarding what passengers are allowed to say or debate while riding its buses. Nor does COLTS have any rules "with respect to what people [on the buses] can and cannot speak about."

In May 2011, COLTS' employee Jim Smith received a phone call from a man who wanted to run an ad that said "Judgment Day is Coming in May." Smith and Wintermantel were alarmed by the proposed "Judgment Day" advertisement since it "seem[ed] religious." Wintermantel then reviewed the website affiliated with the advertisement and discovered that it was religious in nature. Thus, they went to Fiume and to the COLTS' solicitors and it was decided since the ad was religious, "it could be controversial, and we didn't want anything happening inside our buses, any debates or arguments." Even though COLTS had never "informed a potential advertiser that [it] would not run their ad," COLTS contacted the person who requested the "Judgment Day" advertisement and told him that his ad would not be allowed on the buses. COLTS based its denial of the "Judgment Day" advertisement on the

fact that it was religious in nature and COLTS "didn't want any pro or con kind of religion being discussed on the buses . . . Ads that are religious in nature can cause heated debates and heated arguments on either side." Wintermantel also stated that COLTS believed running the "Judgment Day" advertisement was unsafe since she read about other transit agencies which ran pro-atheist or pro-God ads which made buses places for debate and lead to vandalism of buses in New York in one case.

Based on media reports from other states, COLTS officials became concerned that atheist groups might also try to advertise on COLTS buses and start a "war of words," and that buses would become a "place for debate" that could make riders feel unwelcome. COLTS officials also thought that this may lead to vandalism of the buses or compromise safety.

Following the proposed "Judgment Day" advertisement, Wintermantel suggested an advertising policy and drafted COLTS' first formal advertising policy. The policy was approved by COLTS' Board of Directors on June 21, 2011 ("2011 Policy"). The 2011 Policy provided as follows:

COLTS will **not** accept advertising:

• for tobacco products, alcohol, and political candidates

• that is deemed in COLTS['] sole discretion to be derogatory to any
  race, color, gender, religion, ethnic background, age group, disability,
  marital or parental status, or sexual preference

• that promotes the use of firearms or firearm-related products

• that are obscene or pornographic

- that promotes violence or sexual conduct
- that are deemed defamatory, libelous or fraudulent based solely on the discretion of COLTS
- that are objectionable, controversial or would generally be offensive to COLTS' ridership based solely on the discretion of COLTS

The 2011 Policy also stated, "Finally, it is COLTS' declared intent **not** to allow its transit vehicles or property to become a public forum for dissemination, debate, or discussion of public issues."

The 2011 Policy was not designed to increase COLTS' ridership. Nor was this policy prompted by any revenue-related goals or concerns. Further, the 2011 Policy had no effect on COLTS' ridership. Wintermantel stated that the policy was enacted since COLTS did not want debates or arguments on its buses and since it was concerned with the safety of its passengers. Specifically, COLTS did not "want people debating or arguing on our buses in a small confined space [regarding] advertisements that may be controversial or debatable." Wintermantel stated that "the intent [behind the 2011 Policy] is to not allow people to start arguing over issues . . . if there's an ad for Donald Trump running on one of our buses you could imagine there would be huge fights on our bus given the political atmosphere that's out there today."

COLTS' 2011 Policy had the specific goal "[of] prevent[ing] debate inside of COLTS' buses . . . and [the policy] had nothing to do with debate outside the buses" despite the fact that the 2011 Policy applied to

8

advertisements on both the outside and inside of COLTS buses. Further, the policy did not distinguish between proposed advertisements for the inside and outside of the bus and, it applied to all advertising. COLTS acknowledged that its passengers discuss and debate public issues during their rides, but it admitted that "there haven't been any . . . fights that have broken out" on the buses. COLTS also admitted that such discussions and debates by its riders has never effected a COLTS bus driver's ability to do his or her job in a safe and efficient manner.

Fiume testified he was not aware of any problems that COLTS had on its buses based on debates amongst riders and that he was not aware if any public issues were even debated on the buses before the 2011 Policy was enacted.

At the time the 2011 Policy was being drafted, a gun company called Northeast Firearms wanted to put an ad on a COLTS bus and it was not allowed since there would be a provision banning ads promoting the use of firearms in the policy when it was finalized.

On January 30, 2012, Vacula sent an email to Smith on behalf of plaintiff seeking to run an advertisement on the outside of COLTS buses containing an image of clouds and the word "Atheists" in large print above the URL address of the plaintiff's webpage (www.NEPAFreethought.org). (Doc. 33-1, Ex. J). This was plaintiff's first proposed ad it submitted to COLTS. Vacula stated that plaintiff wanted to place the ad on COLTS buses to recruit potential members. Vacula also stated that he was aware that COLTS buses

displayed the message "God Bless America" on their electric head signs and that it was a scrolling marquee-type message. After seeing the "God Bless America" message the first time in 2012, Vacula called COLTS and asked about the message and why it was on buses. Vacula stated that his ad was intended to be a response to the "God Bless America" message, to challenge COLTS' advertising policy and to advertise his organization. Vacula contacted the Freedom from Religion Foundation regarding the "God Bless America" message and this organization sent a letter to COLTS complaining about the message. While the "God Bless America" message was in the COLTS' programming system, officials did not instruct the drivers that it was okay for them to put it in the system. In fact, Wintermantel stated that prior to 2012, drivers were instructed that they could not display the "God Bless America" message. After his complaint, Vacula stopped seeing the message on COLTS buses. Fiume stated that the "God Bless America" sign was run on an electric sign which was controlled by the drivers and not sold to advertisers and that this message was later removed from the bus' software.

Subsequently, Vacula saw a ribbon on a COLTS bus that said "God Bless America" and he emailed COLTS' solicitor about it. The ribbon was taken down after the email. Wintermantel stated that to her knowledge COLTS drivers were not permitted to display such ribbons on their buses but she did not know of any document that contained this prohibition. It is undisputed that neither "God Bless America" message was an advertisement. As of January 2012, COLTS was under the impression that its bus drivers

were told not to run head signs that contained religious messages.

Smith showed Vacula's January 2012 email to Wintermantel to see if COLTS would accept the ad or if it violated COLTS' policy. Prior to receiving the proposed ad, COLTS had never heard of plaintiff. Wintermantel went to Fiume with the ad and to the solicitors, and she eventually went to plaintiff's website. She concluded that plaintiff wanted to advertise so that it could spark debate on COLTS buses. In fact, Vacula admitted that one thing that plaintiff did was debate the existence or nonexistence of God but that this was not its mission. He also stated that plaintiff sought to get community support in upholding the principle of separation of church and state, and that he believes the government should be out of the religion business. However, he stated that if the government gets involved with religious ads, then it should treat other viewpoints equally.

In February 2012, COLTS decided to reject plaintiff's proposed advertisement because the word "Atheists" would likely cause its passengers to engage in debates about atheism aboard the buses, and this was contrary to COLTS' advertising policy which was to avoid debates on its buses. The content of plaintiff's website "supported" COLTS' decision to reject plaintiff's proposed advertisement since COLTS believed that the website showed "that [plaintiff's] intent was to cause debate." Wintermantel also stated that she thought the ad was religious in nature but not derogatory toward religion. However, COLTS still would have rejected the proposed advertisement even if it had not listed plaintiff's website address since it concluded that the word

"Atheists" was likely to promote debate on the buses. COLTS viewed advertisements containing particular words such as "Atheist," "Agnostics," "Catholic," "Jews," "Muslims," or "Hindu", as well as any word referring to a religion or lack of religion despite the message of the advertisements, "could spark debate on a bus" and "be a controversial issue." Thus, COLTS believed that such ads should not be allowed on its buses. A few days after receiving plaintiff's proposed advertisement, Smith telephoned Vacula and told him that COLTS would not run it. COLTS claimed that the advertisement violated its 2011 Policy.

Despite the fact that COLTS buses no longer displayed the message "God Bless America," Vacula continued to submit ads to COLTS. He indicated in an article on plaintiff's website that his advertisements would be a response to the "God Bless America" message. On August 29, 2013, plaintiff submitted a second proposed advertisement to be placed on COLTS buses. At this time, Vacula was not aware of any more "God Bless America" messages running on COLTS buses. The proposed advertisement stated "Atheists. NEPA Freethought Society." Underneath this statement was "NEPAfreethought.org." COLTS rejected plaintiff's second proposed advertisement for "the same reasons" it had rejected the first proposed advertisement, including COLTS' beliefs that "the word 'atheist' would cause debate on buses" and that the advertisement would offend or alienate its elderly bus riders.

On September 9, 2013, Wintermantel sent a letter to Vacula stating, in part, that COLTS would not display plaintiff's second proposed advertisement

because:

> It is COLTS' goal to provide a safe and welcoming environment on its buses for the public at large. The acceptance of advertisements that promote debate over public issues such as abortion, gun control or the existence of God in a confined space like the inside of a bus detracts from this goal.

(Doc. 33-1, Ex. L, Doc. 31-3, Ex. C).

The letter also stated that "COLTS does not wish to become embroiled in a debate over your group's viewpoints."

Wintermantel also testified that plaintiff's ad was rejected because the word "atheist" suggests the nonexistence of a supreme deity which is a public issue that she believed would promote debate on the buses.

Vacula saw comments on the Scranton Times website about an article regarding the "God Bless America" message on COLTS buses and the rejection of plaintiff's advertisement and some people were upset plaintiff's ad was rejected and others agreed with the rejection. The plaintiff's proposed ads lead to general public discussion. There were other bloggers and websites which wrote about the rejection of plaintiff's ads and debated the issue. Although the purpose of plaintiff's ads was not to spark debate, Vacula agreed that as a result of the advertisements being rejected, a discussion occurred about the existence of God.

Other than plaintiff's two proposed advertisements, COLTS only rejected one other proposed advertisement under its 2011 Policy, namely, an advertisement proposal for the "Wilkes-Barre Scranton Night Out" which stated:

13

WBSNightOut.com

Stay Connected With Our Free Smartphone App!

"My Night Out"

Your link to everything fun!

(Doc. 33-1, Ex. M).

The above "NightOut" advertisement was rejected by COLTS in May 2012 since the website had links to bars. Wintermantel made the decision to reject this advertisement but she admitted "[w]ould I have made the decision again the same way, probably not, but I did at the time."

On September 17, 2013, COLTS enacted a new advertising policy (the "2013 Policy") to "clarify" the 2011 Policy and to more clearly "set forth the types of advertisements it will and will not accept[.]" COLTS' 2013 Policy, which is currently still in effect, provided in part:

> **It is COLTS' declared intent to maintain its advertising space on its property as a nonpublic forum and not to allow its transit vehicles or property to become a public forum for the dissemination, debate, or discussion of public issues or issues that are political or religious in nature.**

(Doc. 33-1, Ex. N, Doc. 31-4, Ex. D) (emphasis original). The new policy also provided that COLTS will not accept advertisements "that promote the existence or non-existence of a supreme deity, deities, being or beings ...." (Id.). The policy also contained a disclaimer provision requiring ads to state

that the views in the ads were not those of COLTS.[5]

Wintermantel stated that the intent of the above provisions was "to not allow people [on the buses] to start arguing over issues." The 2013 Policy applies equally to advertisements on the inside and outside of COLTS buses. Further, COLTS has never distinguished between advertisements on the interior and exterior of its buses regarding the approval of an advertisement. COLTS believes that debates on buses "could be dangerous" and render the buses "potentially unsafe." Wintermantel testified that the 2013 Policy was not enacted in response to Vacula and, that it was not prompted by any proposed ad. In fact, she stated that the 2013 Policy was in the works since March 2012. Wintermantel also testified that COLTS was concerned that advertisements that spark debate might cause a decrease in ridership among the elderly. However, no senior citizen ever indicated to COLTS that they would not ride the buses if certain advertisements were accepted.

In its 2013 Policy, COLTS sought to preclude issues that are "political or religious in nature" because politics and religion are topics that people "feel strongly about[.]" COLTS also did not allow ads dealing with firearms due to the strong opinions that people have about guns. Since CLOTS enacted the 2013 Policy, Vacula did not know whether any ads have run on buses which

---

[5]Since the complete 2013 Policy is found at Doc. 33-1, Ex. N and Doc. 34-1, Ex. D, the court will not repeat any other portions of it herein. Further, this policy speaks for itself and the court will not repeat the parties' extrapolation of its meaning as material facts. This note also applies to other documents submitted as evidence when the parties state portions of them in their material facts.

violated the policy. Nor did Wintermantel know of any ads currently running that violated the 2013 Policy.

On July 21, 2014, plaintiff submitted a new proposed ad to COLTS which stated "Atheists. NEPA Freethought Society. meetup.com/nepafreethoughtsociety." The ad was the same as the other ads plaintiff submitted except it contained a different URL address. This ad was rejected the same day it was received in a letter Wintermantel sent to Vacula pursuant to COLTS' 2013 Policy and its prohibition on "religious" advertisements. (Doc. 33-1, Exs. O & P). Wintermantel testified that the ad was rejected since she believed "it addressed the nonexistence of a deity." She also stated that it was COLTS' position that the word "Atheists" on the advertisement would "promote debate over a public issue" in violation of COLTS' advertising policy. (Doc. 33-1, Ex. C, pp. 100-104).

Also, on July 21, 2014, plaintiff submitted another proposed ad to COLTS, its fourth. (Doc. 1, Ex. I, Doc. 33-1, Ex. Q). This latest ad was identical to the proposed ad rejected earlier that day but it omitted the word "Atheists." Wintermantel sent Vacula an email on July 22, 2014 accepting his latest ad to run on COLTS buses since she said that it no longer violated COLTS' policy. Plaintiff's fourth ad was placed on the outside of a COLTS bus in October or November of 2014. COLTS did not receive any complaints about this advertisement. Nor did it receive any reports of passengers debating the advertisement on its buses.

In addition to the ad proposals received from plaintiff, COLTS received

16

ads from other groups, and some were accepted and some were rejected.

In April 2012, COLTS displayed an advertisement for "National Infant Immunization Week" on its buses. The advertisement (Doc. 33-1, Ex. R) contained a picture of a baby and said "Love Them, Protect Them, Immunize Them." COLTS interpreted this advertisement as a message "encouraging people to vaccinate their children." Even though COLTS was not aware of any debates amongst its riders over this ad, COLTS indicated that if this ad were proposed today, it would be rejected since the issue of vaccinating children is open to public debate and too controversial.

Additionally, in 2011, COLTS accepted and displayed an advertisement from the Diocese of Scranton's "Adoption for Life" campaign that said "Consider Adoption . . . It Works!" (Doc. 33-1, Ex. S). Wintermantel stated that COLTS does not believe that a Catholic religious organization's pro-adoption advertisement could be construed as an "anti-abortion ad" and, that if such an advertisement were proposed today, she would "recommend under the 2013 Policy that this ad be run." It did not matter to COLTS that this ad was paid for by a religious organization despite the fact that it believes religion is a controversial issue.

At the time the 2011 Policy was enacted, COLTS was running an advertisement for a beer distributor called "Brewers Outlet." Despite the 2011 Policy's ban on advertisements for alcohol, COLTS continued to run advertisements for Brewer's Outlet until its contract expired in April 2012 because "[Brewer's Outlet sell[s] other things besides beer." However, as

17

mentioned, in May 2012, COLTS rejected an advertisement for the Wilkes-Barre Scranton "NightOut" based on the fact that the website listed on the advertisement contained advertisements for bars.

In February 2014, COLTS rejected, under its 2013 Policy, an advertisement proposal submitted by Lutheran Home Care & Hospice, Inc. advertising home health care and hospice services "because of the cross in the logo and the word Lutheran" and because COLTS thought the ad could have initiated debates on its buses. (Doc. 33-1, Ex. T).

COLTS also admitted that under the 2013 Policy, it would have rejected the "St. Stanislaus Polish Food Festival" ad that it previously ran since it contained a reference to "St. Stanislaus Elementary School," and because it was "religious in nature and could possibly cause debate." COLTS further stated that the O'Malley campaign ad previously run would not be permitted under the 2013 Policy's prohibition on "political" advertisements.

Every year since 2013, COLTS has agreed to display advertisements on its buses paid for by County Commissioner O'Malley for "Patrick O'Malley's . . . Annual Free Children's Halloween Party" because the advertisements did not mention his elected position or candidacy, and because COLTS believes that a Halloween party has "no relation to politics[.]" (Doc. 33-1, Ex. U). Additionally, these ads did not contain the disclaimer which was required by the 2013 Policy.

## III. STANDARDS OF REVIEW

### A. Rule 56

COLTS' and plaintiff's motions for summary judgment are brought pursuant to the provisions of Fed.R.Civ.P. 56. Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Aetna Casualty & Sur. Co. v. Ericksen, 903 F. Supp. 836, 838 (M.D. Pa. 1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249; *see also* Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007).

Moreover, the Third Circuit indicated that "although the party opposing summary judgment is entitled to 'the benefit of all factual inferences in the

court's consideration of a motion for summary judgment, the nonmoving party must point to some evidence in the record that creates a genuine issue of material fact,' and 'cannot rest solely on assertions made in the pleadings, legal memorandum or oral argument.'" [Goode v. Nash, 241 Fed. Appx. 868 (3d Cir. 2007)](citation omitted). A material factual dispute is one that may affect the outcome of the case under applicable law. [Anderson v. Liberty Lobby, Inc., 477 U.S. at 248](url).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. [Celotex, 477 U.S. at 323-24](url). The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." [In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003)](url); see also [Celotex, 477 U.S. at 325](url). If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. [Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998)](url) (quoting [Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986)](url)). However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial."

Celotex Corp., 477 U.S. at 322-23; Jakimas v. Hoffman La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007); Watson v. Eastman Kodak Co., 235 F.3d 851, 858 (3d Cir. 2000) (the non-movant must establish the existence of each element on which it bears the burden of proof).

### B. Section 1983

To state a claim under §1983, a plaintiff must meet two threshold requirements. A plaintiff must allege: 1) that the alleged misconduct was committed by a person acting under color of state law; and 2) that as a result, he was deprived of rights, privileges, or immunities secured by the Constitution or laws of the United States. West v. Atkins, 487 U.S. 42 (1988); Parratt v. Taylor, 451 U.S. 527, 535 (1981), *overruled in part on other grounds*, Daniels v. Williams, 474 U.S. 327, 330-331 (1986). If a defendant fails to act under color of state law when engaged in the alleged misconduct, a civil rights claim under §1983 fails as a matter of jurisdiction, Polk Cnty. v. Dodson, 454 U.S. 312, 315 (1981), and there is no need to determine whether a federal right has been violated. Rendell-Baker v. Kohn, 457 U.S. 830, 838 (1982).

Since COLTS is a municipal agency, the standards annunciated in *Monell* apply to it. *See* Malles v. Lehigh County, 639 F.Supp.2d 566 (E.D.Pa. 2009). Under the Supreme Court precedent of Monell v. Dep't. of Soc. Servs., 436 U.S. 658, 694 (1978), a municipality can be held liable under §1983 only if the plaintiff shows that the violation of his federally protected rights resulted

21

from the enforcement of a "policy" or "custom" of the local government. A court may find that a municipal policy exists when a "'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)). It is also possible for a court to find the existence of a municipal policy in "the isolated decision of an executive municipal policymaker." City of St. Louis v. Praprotnik, 485 U.S. 112, 139 (1988). "A course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanent and well settled' as to virtually constitute law." Andrews, 895 F.2d at 1480 (citations omitted). There must be a "direct causal link" between the municipal policy or custom and the alleged constitutional violation. City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989).

## IV.    DISCUSSION

At issue are COLTS' policies and plaintiff's constitutional challenge to them under the First Amendment. "The Supreme Court has outlined a three-step analysis regarding a prima facie case of alleged First Amendment violations." Am. Freedom Defense Initiative v. SEPTA, 92 F.Supp.3d 314, 322 (E.D.Pa. 2015) (citing Cornelius v. NAACP Legal Def. & Educ. Fund, 473 U.S. 788, 797, 105 S.Ct. 3439 (1985)). First, the court must "determine whether the advertisement in question constitutes speech protected by the First

22

Amendment." Second, the court must determine "the nature of the forum created by [COLTS'] advertising space" "because the appropriate level of scrutiny depends on the categorization of the forum." Id. Third, the court must exam "whether the anti-disparagement standard at issue survives the applicable level of scrutiny." Id.

The Supreme Court has long established that a citizen's ability to participate in free debate on matters of public importance is "the core value of the Free Speech Clause of the First Amendment." Pickering v. Bd. of Educ., 391 U.S. 563, 573 (1968); *see also* Connick v. Myers, 461 U.S. 138, 145 (1983); NAACP v. Claiborne Hardware Co., 458 U.S. 886, 913 (1982); Am. Freedom Defense Initiative, 92 F.Supp.3d at 322 ("The proposition that the First Amendment strongly protects the right to express opinions on public questions has 'long been settled' by Supreme Court precedent.") (citation omitted).

Plaintiff's ads containing the word "Atheists" in large font with an image of clouds as a backdrop references a belief in the non-existence of a deity, which is protected speech since it reflects plaintiff freethought organization's belief or view pertaining to a lack of religion. *See* Am. Freedom Defense Initiative, 92 F.Supp.3d at 322  (Court held that the plaintiff's advertisement for SEPTA buses was protected speech involving political and religious expression since it contained statements about foreign aid and references to the Quran.). Thus, plaintiff's ads are protected by the First Amendment. The court must now determine "the nature of the forum created by [COLTS']

advertising space." Id. at 323.

"The government does not have 'to grant access to all who wish to exercise their right to free speech on every type of [government] property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities.'" Pittsburgh League of Young Voters Educ. Fund v. Port Authority of Allegheny County, 653 F.3d 290, 295 (3d Cir. 2011) (quoting Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 799–800, 105 S.Ct. 3439 (1985)). "The Supreme Court has developed a forum analysis to determine when the government's interest in limiting the use of its property outweighs the interest of those wishing to use the property as a place for expressive activity." Id. (citing Cornelius, 473 U.S. at 799–800).

The Supreme Court has found that there are three types of fora. Id. (citing Christian Legal Soc'y v. Martinez, 561 U.S. 661, 130 S.Ct. 2971, 2984 n. 11 (2010)). The type of forum determines the level of scrutiny to which the restrictions on speech are subjected. "In traditional public fora, content-based restrictions on speech are subject to strict scrutiny (i.e., the restrictions must be narrowly tailored to serve a compelling governmental interest)". Id. (citing Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948 (1983))."The traditional public forum includes spaces which 'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions [such as streets and parks].'" Am. Freedom Defense Initiative, 92 F.Supp.3d at 323 (citation

omitted).

"A designated public forum is public property 'that has not traditionally been regarded as a public forum' but that the government has intentionally opened up for use by the public as a place for expressive activity." Id. (citing Pittsburgh League of Young Voters Educ. Fund, 653 F.3d at 296); *see also* Pleasant Grove City v. Summum, 555 U.S. 460, 129 S.Ct. 1125, 1132 (2009)); Christ's Bride Ministries, 148 F.3d at 248 (the court asks whether the government "clearly and deliberately opened its advertising space to the public."). In designated public fora, "content-based restrictions are subject to strict scrutiny." Pittsburgh League of Young Voters Educ. Fund, 653 F.3d at 296) (citing Perry, 460 U.S. at 45).

The third type of fora consists of "public property that 'is not by tradition or designation a forum for public communication' [and this] constitutes a nonpublic forum." Id. (citing Perry, 460 U.S. at 46). "Access to a nonpublic forum can be restricted so long as the restrictions are reasonable and viewpoint neutral." Id. (citing Cornelius, 473 U.S. at 800).

The relevant forum is COLTS' advertising space on its buses, as opposed to all of COLTS' property, since this is the specific public property that plaintiff is seeking to access. *See* Cornelius, 473 U.S. at 801. The court must now determine the type of forum in the instant case. In Am. Freedom Defense Initiative, 92 F.Supp.3d at 324, the court explained:

> In conducting the forum analysis, courts "look to the [COLTS'] intent with regard to the forum in question and ask whether [COLTS] clearly and deliberately opened its advertising space to

the public." Christ's Bride Ministries, 148 F.3d at 248–49. "[COLTS'] own statement of its intent, however, does not resolve the public forum question." Id. at 251. Rather, intent is gauged by examining [COLTS'] "policies and practices in using the space and also the nature of the property and its compatibility with expressive activity." Id. at 249. Restrictions on the use of the forum "do not necessarily mean that [COLTS] has not created a public forum. They may demonstrate instead that [COLTS] intended to create a limited public forum, open only to certain kinds of expression." Id.

The court has previously found that a determination of the issue regarding the type of forum which existed on COLTS' buses required a complete factual record and that record now exists. Thus, this forum analysis shall now be addressed.

COLTS argues that the evidence fails to support plaintiff's First Amendment claim under §1983 since COLTS' policies satisfy the scrutiny applicable to a nonpublic forum. COLTS states that the evidence shows its advertising space should be classified as a limited or nonpublic forum and, shows that its intent was only to create such a forum.[6] COLTS states that to establish a designated public forum, plaintiff must produce "some evidence to [show] COLTS' intent to open the forum to the discussion of the existence or non-existence of god." (Doc. 46 at 2). COLTS maintains the evidence shows that its intent was to create a nonpublic forum with respect to the advertising space on its buses and that plaintiff has specifically failed to show

---

[6]The Third Circuit has noted that the terms limited forum and nonpublic forum are interchangeable and that these categories of forum are the same. *See* NAACP v. City of Phila., 834 F.3d 435, 441 n. 2 (3d Cir. 2016). The court shall use only the term nonpublic forum herein.

26

that its intent was to open the forum to the discussion of the existence or non-existence of god. COLTS points out that it has never allowed any ads to run discussing this issue either before or after it adopted its advertising policies. COLTS also indicates that it did not accept any controversial public issue advertisements which shows that it did not want to open up the space on its buses to expressive conduct, and thus its advertising space is a nonpublic forum.

COLTS states because the advertising space on its buses is a nonpublic forum, access to its space can be restricted so long as the restrictions are reasonable and viewpoint neutral. COLTS also states that since its policy precludes all viewpoints on the issue of the existence or non-existence of God it is viewpoint neutral. COLTS argues that the evidence shows its intent was merely to create a nonpublic forum, open only to certain kinds of expression and that its 2013 Policy contained viewpoint neutral criteria for selecting content of ads on its property. COLTS states that the evidence demonstrates that its intention was not to allow ads promoting or attacking religion and that plaintiff was ultimately allowed to advertise the name of its organization and its website address when it deleted the word "Atheists" from its ad.

As such, COLTS contends that the evidence fails to show that its advertising space was ever opened up to ads which would have created a designated public forum on its buses. "Restrictions on speech in a non-public forum are permissible so long as they are reasonable and viewpoint neutral."

Id. at 324. COLTS states that its advertising policies are viewpoint neutral and reasonable regulations of private advertising in a nonpublic forum.

Plaintiff argues that COLTS' advertising space on its buses was a designated public forum since COLTS "intentionally opened up [this space] for use by the public as a place for expressive activity." Plaintiff states the evidence shows that COLTS' adverting space on its buses is a designated public forum since its policies and practices demonstrate that it intended to open its spaces to speech by the general public regardless of COLTS' contention that it did not intend to create a designated public forum. Since COLTS' advertising space on its buses constitutes a designated public forum, plaintiff maintains COLTS' policies with their content-based speech restrictions are subject to strict scrutiny. Specifically, plaintiff contends that COLTS' 2013 Policy "restricts speech for the explicit purpose of suppressing debate and discussion of public issues among bus riders, a goal that is not a legitimate reason for government censorship." Plaintiff also contends that COLTS' advertising space on its busses should be classified as a designated public forum despite COLTS' intent.

A determination as to whether COLTS' advertising space is a designated public forum requires the court to engage in a fact-specific analysis of the forum itself. Christ's Bride Ministries, Inc. v. Se. Pa. Transp. Auth., 148 F.3d 242, 248-52 (3d Cir. 1998) (To determine whether the government agency clearly and deliberately opened its advertising space to the public, courts must examine not only the agency's policies, but also its

practices in using the space, and the nature of the space and its compatibility with expressive activity). As such, COLTS' written policies alone are not sufficient to determine whether COLTS has created a designated public forum on its advertising space.

Initially, the court finds that the advertising space on COLTS' buses is a forum and that it is not a traditional public forum. *See* Am. Freedom Defense Initiative, 92 F.Supp.3d at 324*.* The parties do not agree as to whether the space on the buses is a designated public forum or a nonpublic forum. Plaintiff argues the former while COLTS argues the latter. COLTS' intent as to what type of forum it sought to create on its buses "is not dispositive of the forum analysis." Id. at 326 (citation omitted). Nor is it dispositive that COLTS did not intend to accept the specific speech at issue implied in plaintiff's proposed ads, namely, the existence or non-existence of God. Rather, the court's focus is "on the evidence of [COLTS's] actual policies and practices." Id.

The evidence shows that COLTS opened its advertising spaces on buses for sale to the general public for the purpose of raising revenue. Plaintiff states that "COLTS' policies and practices with respect to its advertising spaces—as well as the nature of advertising spaces, which are not just compatible with expressive activity but designed for that very purpose—reinforce the conclusion that COLTS has clearly, intentionally created a forum for public speech." (Doc. 52 at 8). COLTS states that its policy prohibits political ads as well as all public issue ads from appearing on

29

its buses. It also states that its policy limits the scope of ads allowed on its buses to only ads with uncontroversial speech and that pursuant to its policy it does not accept public issue ads. COLTS contends that the evidence shows that it did not intend to open the space on its buses as a forum for expression on public issue speech.

COLTS' 2013 Policy, (Doc. 1, Ex. F, Doc. 33-1, Ex. N), specifically provided that COLTS will not accept advertisements: "that promote the existence or non-existence of a supreme deity, deities, being or beings; that address, promote, criticize or attack a religion or religions, religious beliefs or lack of religious beliefs; that directly quote or cite scriptures, religious text or texts involving religious beliefs or lack of religious beliefs; or are otherwise religious in nature." The 2013 Policy also provided that it is COLTS' "intent to maintain its advertising space on its property as a nonpublic forum and not to allow its transit vehicles or property to become a public forum for the dissemination, debate, or discussion of public issues or issues that are political or religious in nature." All of the enumerated prohibited ads specified in the 2013 Policy are found at Doc. 33, ¶ 33.

However, plaintiff states that "COLTS [has] a history of running non-commercial ads on issues of public concern, including [in 2011], the Diocese of Scranton's 'Adoption for Life' ad that said 'Choose Adoption… It Works!,' an ad [in April 2012] for 'National Infant Immunization Week,' and [every year since 2013] annual advertisements for a free children's Halloween party hosted by [County Commissioner O'Malley]." (Doc. 52 at 14). COLTS

explained that the O'Malley ad did not reference his political office or his candidacy. Additionally, when COLTS' 2011 Policy was enacted, it was running an ad on its buses for a beer distributor called "Brewers Outlet" and it continued to run this ad until its contract expired in April 2012 despite the policy's ban on alcohol related ads. COLTS indicated that the outlet sold other items such as food, soda, and lottery tickets. After the adoption of both policies, COLTS also rejected an ad in May 2012 for "Wilkes-Barre Scranton NightOut" since the website on the ad contained ads for bars, and in February 2014, COLTS rejected an ad proposed by Lutheran Home Care & Hospice since a cross was in its logo and since it contained the word Lutheran. Thus, plaintiff also argues that COLTS' polices have led to arbitrary results as to the types of ads it accepts and rejects.

The evidence shows that COLTS drafted and implemented its policies to prevent controversy and public debate on its buses and that it tried to apply the policies in a specific, consistent, and careful manner. The advertisers had to obtain permission from COLTS to access the space on its buses and COLTS had a process to review proposed ads demonstrating its intent to control access to its buses. There is no dispute that COLTS has rejected proposed ads. Nor is there any dispute that COLTS has run non-commercial ads on issues that could be construed as matters of public concern as plaintiff has pointed out. However, the examples plaintiff has relied upon to show COLTS had allowed non-commercial ads on issues of public concern does not demonstrate that COLTS had a history of running such ads. The O'Malley

Halloween party ad does not even relate to an issue of public concern and the reference to its sponsor is hardly a political endorsement. Rather, the evidence shows that COLTS has attempted to maintain strict controls over the types of ads it has permitted on its buses since June 21, 2011 when it adopted its 2011 Policy and enforcement of its policies prohibiting all controversial speech in ads has been consistent with its goals of excluding ads that would lead to debates and arguments on its buses and, of transporting its riders safely to their destinations.

In light of COLTS' 2011 and 2013 written policies, which provide for the exclusion of very specific type of ads, and based on COLTS' practice of permitting only limited access to the space on its buses, the court finds that COLT did not create a designated public forum. Additionally, COLTS deliberately chose not to create a forum that was suitable for the speech in question, namely, the existence or non-existence of God. Rather, the space on COLTS' buses is a nonpublic forum. COLTS' advertising policies and its declared intent show that it did not open up its space on buses to become a public forum for the dissemination, debate, or discussion of any public issues, and show that COLTS tried to restrict access to the forum leading to the rejection of proposed ads it deemed controversial. Indeed, COLTS' policies prohibit political, public issue and controversial advertisements. COLTS' officials reviewed proposed ads to determine if they were controversial or if they would provoke debates and arguments on the buses. In fact, when plaintiff's ad omitted the word "Atheists" which COLTS deemed controversial,

its ad was permitted on the buses. Thus, COLTS' policies and practices show that the space on its buses was not open to and suitable for speech concerning public issues, and the evidence shows that COLTS did not have a history of allowing such ads.

The court must now determine whether COLTS' policies comport with the prescribed level of scrutiny applicable to a nonpublic forum. As stated, restrictions on speech in a nonpublic forum are allowed if they are reasonable and viewpoint neutral. Perry Educ. Ass'n, 460 U.S. at 46; NAACP v. City of Phila., 834 F.3d 435, 441 (3d Cir. 2016). A nonpublic forum has "the least protection under the First Amendment." NAACP, 834 F.3d at 441. "[T]he 'Government's decision to restrict access ... need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation.'" Id. (quoting Cornelius, 473 U.S. at 808, 105 S.Ct. 3439 (emphasis in original). Additionally, "the government's asserted interest in drawing content-based distinctions must be valid, but it does not have to be compelling." Id. (citation omitted). However, First Amendment protections still exist in a nonpublic forum. Id. at 443.

The burden is on COLTS to show that its restrictions on the ads allowed on its buses are reasonable. Id. at 443-44. COLTS can meet its burden in two ways, namely, "record evidence or commonsense inferences." Id. at 444. The Third Circuit in the *NAACP* case, id. at 445, summarized how the government can satisfy its burden as follows:

the City has a two-step burden that it can satisfy using record

evidence or commonsense inferences. First, given that reasonableness "must be assessed in the light of the purpose of the forum and all the surrounding circumstances," Cornelius, 473 U.S. at 809, 105 S.Ct. 3439, the evidence or commonsense inferences must allow us to grasp the purpose to which the City has devoted the forum. *See also* Greer v. Spock, 424 U.S. 828, 836, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) ("The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.") (internal quotation marks omitted). And second, the evidence or commonsense inferences also must provide a way of tying the limitation on speech to the forum's purpose. The City need not prove that the banned speech would cause harm if permitted, but per *ISKCON* it must provide a legitimate explanation for the restriction.

No doubt that COLTS "is permitted under the right circumstances to dedicate a limited public or nonpublic forum to controversy avoidance." Id. at 446. However, "Supreme Court guidance cautions against readily drawing inferences, in the absence of evidence, that controversy avoidance renders the ban constitutional." Id.

"Reasonableness is a case-specific inquiry" which requires the court "to determine reasonableness on a case-by-case basis in light of the facts and circumstances of each particular forum." NAACP, 834 F.3d at 448. COLTS states that the restrictions in its policies are content-neutral and reasonable based on the forum. COLTS cites to Lehman v. City of Shaker Heights, 418 U.S. 298, 303-04, 94 S. Ct. 2714 (1974), in which the Supreme Court upheld a policy of excluding political advertisements in public buses. COLTS states that it will not accept ads that promote the existence or non-existence of a supreme deity and ads that promote or criticize religion or the lack of religion.

It states that it did not intend to make its buses a public forum to discuss public issues or issue that are political or religious in nature. The *Lehman* case is not determinative of the reasonableness of restrictions on ads for all cases. NAACP, 834 F.3d at 448 (citation omitted). The court must exam case-by-case the governmental interest and the nature and function (or purpose) of the specific forum. Id. at 448-49 (citation omitted).

The evidence shows that COLTS was trying to avoid arguments and debates amongst its riders on its buses and to restrict all public issue and controversial ads. COLTS was concerned about potential dangerous situations on its buses resulting from heated debates on public issues. In fact, COLTS' officials testified that safety of its riders was a priority. COLTS was also concerned with its older passengers and believed that debates of public issues on its buses would deter senior citizens from riding its buses. COLTS does not have to show that the prohibited speech would cause harm if it was allowed, rather it only has to show by the evidence or commonsense inferences that it could be potentially dangerous to allow ads which may cause heated debates on its buses. As indicated, Vacula admitted that one of purposes of plaintiff's ad was to start debate on the existence or non-existence of God and that this issue was the subject of debate in other fora. COLTS states that the purpose of its buses is to provide safe and reliable public transportation as well as a welcoming environment on its buses for the public, and that its intent is not to allow its buses to become a forum for debate on controversial, political or religious issues. Thus, COLTS states that

the restrictions in its polices are reasonable.

Plaintiff has indicated there is no evidence that shows allowing ads that may spark debate on buses causes any decrease in passengers. Plaintiff also states that many of the ads banned by the 2013 Policy previously ran on COLTS buses and that "COLTS was unaware of any disruption on a COLTS bus caused by an ad or by debate among passengers." (Doc. 41 at 17).

Based on the discussion above, the court finds that the evidence is disputed as to whether COLTS' restrictions on the ads permitted on its buses are reasonable in terms of meeting its objective of controversy avoidance.

Plaintiff also contends the evidence shows that COLTS' restrictions on noncommercial content in the advertising space on its buses was not reasonable in terms of its objective of raising revenue. Plaintiff states that even though COLTS decided to sell advertising space on its buses for the sole purpose of generating revenue, its 2013 Policy is "not aimed at preserving the forum for its intended revenue-generating purpose." (Doc. 41 at 15). Plaintiff points out that the restrictions on speech in the 2013 Policy are not related to the goal of raising revenue and, that the restrictions actually limit the allowable ads and reduce revenue. Additionally, the evidence does not show that COLTS' policies were designed to increase the number of bus passengers. As such, plaintiff contends the evidence shows that "the speech restrictions adopted by COLTS in 2011 and 'clarified' in 2013 were aimed *not* at the goal of raising revenue, but rather, at the unrelated goal of suppressing debate and discussion." (Id. at 15-16) (emphasis original).

The court finds that the evidence in the record is disputed as to whether COLTS' restrictions in its policies are reasonably related to its goal of raising revenue. Thus, the evidence is disputed whether it was reasonable for COLTS to believe that allowing ads which might spark debate on its buses would cause a decrease in ridership amongst its elderly passengers and would create a safety concern, and the evidence is disputed whether COLTS' restrictions are reasonably related to its revenue raising goal. Nor do commonsense inferences allow COLTS to meet its burden to show that its restrictions are reasonably related to either of its objectives, controversy avoidance or revenue maximization, especially since plaintiff has presented plausibly sufficient evidence to show that COLTS' restrictions are not connected to these goals. *See* NAACP, 834 F.3d at 446.

Thus, the evidence is disputed whether COLTS' policies are reasonable and whether they violate plaintiff's First Amendment rights. *See* NAACP, 834 F.3d at 448. As such, both summary judgment motions will be denied on this basis.

Finally, the court must determine whether COLTS' 2013 Policy is viewpoint neutral, which is the second requirement. In the *NAACP* case, the Third Circuit noted that since it found the airport's restrictions on ads in the forum at issue were unreasonable, it did not address the viewpoint neutrality requirement since "unreasonableness is sufficient by itself to render the policy unconstitutional." Id. at 449 n. 7. In the present case, the court has found that disputed facts exist as to whether COLTS' policies are reasonable which

alone is grounds to deny both summary judgment motions. However, plaintiff has also raised a viewpoint discrimination claim which the court must now consider since plaintiff would be entitled to relief if it establishes this claim.[7]

"[I]n *Cornelius* the [Supreme] Court suggested that a restriction will be unconstitutional if it was 'impermissibly motivated by a desire to suppress a particular point of view.'" Id. (citing Cornelius, 473 U.S. at 812–13). The court also finds that the evidence is disputed as to whether COLTS' policies were motivated by an animosity toward certain viewpoints, including the plaintiff's views.

Plaintiff argues that COLTS' "2013 Policy is facially viewpoint discriminatory—and thus unconstitutional even in a non-public forum—because it treats religious speakers differently from non-religious speakers, and controversial speech differently from non-controversial speech." (Doc. 52 at 16-17). Plaintiff claims that COLTS' rejection of its ads mentioning the word "Atheists" was the result of viewpoint discrimination which it states is bolstered by the fact that for several years prior to its policies COLTS had accepted virtually all proposed ads. Plaintiff points out that "COLTS rejected no ads at all prior to 2011 and rejected ads from only two advertisers (including plaintiff) under the 2011 Policy." (Doc. 52 at 15).

---

[7]With respect to plaintiff's viewpoint discrimination claim, it does not matter if the advertising space on COLTS' buses is a designated public forum or a nonpublic forum. Regardless of the designation, plaintiff will prevail in its case if it establishes its viewpoint discrimination claim. *See* Pittsburgh League of Young Voters Educ., 653 F.3d at 296.

However, prior to the 2011 Policy COLTS did in fact reject the "Judgment Day" ad. Nonetheless, plaintiff contends that COLTS' restrictions are motivated by a bias against its views.

COLTS states that its restrictions placed upon the advertising space on its buses are viewpoint neutral in light of the purpose served by the forum, i.e., to raise revenue, and that its policy specifically stated that its intent was not to make its property "a public forum for the dissemination, debate, or discussion of public issues or issues that are political or religious in nature." As such, COLTS states that its policy was not a viewpoint restriction on speech.

"[R]egardless of the forum's classification, viewpoint based restrictions are unconstitutional." Am. Freedom Defense Initiative, 92 F.Supp.3d at 324 (citing Pittsburgh League of Young Voters Educ., 653 F.3d at 296) ("Viewpoint discrimination is anathema to free expression and is impermissible in both public and non-public fora."). "A viewpoint restriction 'targets not subject matter, but particular views taken by speakers on a subject.'" Id. (citing Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829, 115 S.Ct. 2510 (1995); Pittsburgh League of Young Voters Educ., 653 F.3d at 296. Thus, "if the government allows speech on a certain subject in any forum, it must accept all viewpoints on the subject, even those that it disfavors or finds unpopular." Id. (citing Pittsburgh League of Young Voters Educ., 653 F.3d at 296).

As in Pittsburgh League of Young Voters Educ., 653 F.3d at 297,

plaintiff offers a "comparator analysis" to support its viewpoint discrimination claim as opposed to direct evidence of discrimination. Plaintiff has shown that COLTS allowed religious groups to place ads on its buses as well as a beer distributor's ad and a political ad which were in violation of its policies. (Doc. 33, ¶ 15). Plaintiff argues that COLTS unevenly enforced its policies and it abused its discretion by favoring certain groups, such as groups that were religious in nature, over others groups such as its organization. Plaintiff has presented evidence to show that COLTS did not preclude all advertisements, regardless of their viewpoint concerning the existence or nonexistence of a supreme deity, and that it did permit advertisements from religious groups. Plaintiff also has shown that prior to its attempt to advertise, COLTS had an electric sign on the front of its buses stating "God Bless America." Further, plaintiff has shown that up until the time that it sought to advertise, COLTS accepted almost every ad that was presented to it, including ads that violated its own policies. As such, plaintiff maintains that COLTS' policies were not enforced in a content neutral manner and that COLTS was not consistent in its application of its policies.

COLTS presented evidence to show that it does not accept ads that are in any way religious in nature, and ads that either promote the existence of God or promote the non-existence of God. COLTS has also shown that it has rejected other ads which could be construed as religious or controversial.

The court finds that it will be for the finder of fact to determine the similarity between the comparator ads offered by plaintiff as proof of its

viewpoint discrimination claim and plaintiff's ad, and to consider COLTS' evidence showing that COLTS rejected plaintiff's ad not because of hostility towards the ad's message but because the ad was controversial and against it policies of accepting ads promoting the non-existence of God. *See Pittsburgh League of Young Voters Educ., supra* (district court held a trial to determine plaintiff's viewpoint discrimination claim).

Thus, the court finds disputed material facts regarding plaintiff's viewpoint discrimination claim, and both motions for summary judgment will be denied with respect to this claim.

## V. CONCLUSION

For the foregoing reasons and based on the disputed facts in the record, the court will **DENY** COLTS' motion for summary judgment, (Doc. 30), regarding plaintiff's First Amendment claims. Plaintiff's motion for summary judgment, (Doc. 32), will also be **DENIED**. An appropriate order shall follow.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Date: April 10, 2017**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2015 MEMORANDA\15-0833-02.wpd