**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NORTHEASTERN | : | CIVIL ACTION  - LAW |
| PENNSYLVANIA FREETHOUGHT | : | |
| SOCIETY, | : | |
| Plaintiff | : | |
| | : | |
| vs. | : | ELECTRONICALLY FILED |
| | : | |
| COUNTY OF LACKAWANNA | : | |
| TRANSIT SYSTEM | : | 3:15-CV-00833 |
| | : | |
| Defendant | : | |

**DEFENDANT'S POST-TRIAL PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

**PROPOSED FINDINGS OF FACT**

The NEPA Freethought Society is an unincorporated association based in Wilkes-Barre, Pennsylvania. (*See* Statement of Stipulated Facts, Doc. 69, at 1). Justin Vacula is the co-organizer and a spokesperson. (Doc. 69, at 4). One of the activities the it engages in is debating the existence or nonexistence of God. (Doc. 71, at 56; Trial Testimony, hereinafter referred to as "T.T.", at 28-29).  The purpose of the Society is to identify possible violations of the establishment clause in the community, as well as enter into discussions and debates about this topic. (T.T. at 15).  Mr. Vacula testified that he believes the government should remain neutral on religious matters.  (T.T. at 26). Typically, when the Society attends an event, one of the consequences is a debate about the existence or non existence of God. (T.T. at 29).

Robert Fiume has served as COLTS' Executive Director since June 2008. (Doc. 69, at 6). Mr. Fiume delegated responsibility for deciding whether to accept a proposed advertisement to the Advertising Manager, Jim Smith, and later to the Communications Director, Gretchen Wintermantel. (Doc. 69, at 8). As COLTS' Communications Director, Ms. Wintermantel is responsible for interpreting COLTS' advertising policies in order to decide whether or not to accept particular advertisement proposals. At times, Ms. Wintermantel consults with COLTS' management and COLTS' solicitor to determine whether to accept or reject proposed advertisements. (Doc. 69, at 11). COLTS has leased advertising space on the inside and outside of its vehicles since at least 1993. (Doc. 69, at 13). Traditionally, advertising revenue has comprised less than two percent of COLTS' yearly revenue. (Doc. 69, at 15).

In May 2011, Jim Smith, received a phone call from a local man who wanted to run an advertisement that said "Judgment Day is Coming in May." (Doc. 69, at 16). Mr. Smith and Ms. Wintermantel were alarmed by the proposed "Judgment Day" advertisement because it "seem[ed] religious." Ms. Wintermantel reviewed the website affiliated with the advertiser's campaign and confirmed that it was, in fact, religious. (Doc. 69, at 17). Mr. Smith and Ms. Wintermantel, along with Mr. Fiume, decided that the Judgment Day advertisement "could be controversial" because it was "religious." They agreed to reject it because "[a]ds that are religious in nature can cause heated debates and heated arguments on either side," and COLTS did not want

debates or arguments inside the buses. (Doc. 69, at 18). Accordingly, although COLTS had never before informed a potential advertiser that it would not run their advertisement, COLTS informed the potential customer that COLTS would not accept the "Judgment Day" advertisement. (Doc. 69, at 19). COLTS based its denial on the fact that COLTS "felt it was pro-religion" and did not want religion being discussed on the buses because that might "cause heated debates and heated arguments." (Doc. 69, at 20).

Ms. Wintermantel drafted COLTS' first formal advertising policy, which was approved by the COLTS Board of Directors on June 21, 2011. (Ex. 51; Doc. 69, at 21).

On January 30, 2012, Justin Vacula sent an email to Mr. Smith on behalf of the NEPA Freethought Society seeking to run an advertisement on a COLTS bus containing an image of clouds and the word "Atheists" in large font above the URL address of the NEPA Freethought Society's webpage (WWW.NEPAFREETHOUGHT.ORG) in smaller font. (Doc. 69, at 25; Ex. 54) COLTS rejected the NEPA Freethought Society's proposed advertisement based on its belief that the word "Atheists" would likely cause passengers to engage in debates about atheism aboard COLTS' buses. (Doc. 69, at 26). COLTS believed that the words "Atheist," "Agnostics," "Catholic," "Jews," "Muslims," or "Hindu"—or any word referring to a religion or lack of religion—"could spark debate on a bus" and "be a controversial issue" regardless of the context in which the word was used. (Doc.

3

69, at 27; T.T. at 79). A few days after COLTS received the NEPA Freethought Society's proposed advertisement, Mr. Smith telephoned Mr. Vacula to inform him that COLTS would not run the proposed advertisement. (Doc. 69, at 28).

Mr. Vacula indicated in an article on his website that the NEPA Freethought Society's proposed advertisement would be a response to COLTS buses displaying the "God Bless America" message. (T.T. at 34-35; Doc. 71, at 59). Mr. Vacula intended to challenge the COLTS advertising policy. (Doc. 71, at 60).

Even after COLTS buses stopped displaying the "God Bless America" message on head signs, the NEPA Freethought Society continued to submit proposed advertisements to COLTS. (Doc. 71, at 58). The two "God Bless America" messages that Mr. Vacula saw displayed on COLTS buses were not in advertisements. (Doc. 71, at 61; T.T. at 35, 94). After complaining about the message, it was taken down. (T.T. at 36). He also complained about a magnet which was attached to the inside of a bus by a driver, which was taken down after his complaints. (T.T. at 38).When he requested that an advertisement be run, Mr. Vacula was not aware of any "God Bless America" signs currently running on COLTS buses. (Doc. 71, at 62).

On August 29, 2013, the NEPA Freethought Society again submitted an advertisement for placement on COLTS buses. The proposed advertisement stated "Atheists. NEPA Freethought Society. NEPAfreethought.org." (Doc. 69, at 29; Ex. 56). COLTS again rejected the NEPA Freethought Society's advertisement proposal based on COLTS' belief that the word "atheist" would cause debate on buses and

4

based on COLTS' concern that the advertisement would offend or alienate its elderly bus riders. (Doc. 69, at 30). On September 9, 2013, Ms. Wintermantel, writing on behalf of COLTS, sent a letter to Mr. Vacula stating that COLTS would not display the NEPA Freethought Society's proposed advertisement. (Doc. 69, at 31; Ex. 57). In May 2012, COLTS rejected an advertisement proposal for the "Wilkes-Barre Scranton Night Out." (Doc. 69, at 33; Ex. 5).

On September 17, 2013—eight days after it sent a letter to Justin Vacula, denying the NEPA Freethought Society's second advertisement proposal—the COLTS Board of Directors enacted a new policy (the "2013 Policy"), drafted by COLTS' attorneys, to "clarify" the 2011 Policy as COLTS understood it and to more clearly "set forth the types of advertisements it will and will not accept[.]"(Doc. 69, at 36; Ex. 52). The 2013 Policy states: It is COLTS' declared intent to maintain its advertising space on its property as a nonpublic forum and not to allow its transit vehicles or property to become a public forum for the dissemination, debate, or discussion of public issues or issues that are political or religious in nature. (Doc. 69, at 38; Ex. 52). The 2013 Policy was enacted because COLTS wants to prevent debates or argument on its buses. (Doc. 69, at 39). In creating the 2013 Policy, COLTS specifically sought to preclude issues that are political or religious in nature because COLTS believes that politics and religion are topics that people feel strongly about. (Doc. 69, at 40). COLTS believes that debates aboard buses could be dangerous and render the buses potentially unsafe. (Doc. 69, at 41).

On July 21, 2014, the NEPA Freethought Society submitted a new "Atheists" advertisement proposal to COLTS that stated:

Atheists.
NEPA Freethought Society
meetup.com/nepafreethoughtsociety

(Exs. 58 and 59; Doc. 69, at 43).

On June 21, 2014, COLTS sent Mr. Vacula a letter denying the NEPA Freethought Society's advertisement proposal. (Doc. 69, at 44; Ex. 58).  COLTS' denial of the NEPA Freethought Society's proposed advertisement was based on the fact that the proposed advertisement addressed the non-existence of a deity and that the word "Atheists" on the advertisement would promote debate over a public issue, and thus violated COLTS' advertising policy. (Doc. 69, at 46).

On July 21, 2014, the same day that COLTS rejected the NEPA Freethought Society's third advertisement proposal, Mr. Vacula submitted an additional advertisement proposal. (Doc. 69, at 48; Ex. 59). The NEPA Freethought Society's fourth advertisement proposal was identical to the advertisement proposal rejected earlier that day, except that it did not include the word "Atheists." Rather, it only contained the following text:

NEPA Freethought Society
meetup.com/nepafreethoughtsociety

On July 22, 2014, Ms. Wintermantel sent an email to Mr. Vacula agreeing to run the NEPA Freethought Society's proposed advertisement. (Doc. 69, at 49; T.T.

81).  The NEPA Freethought Society's fourth advertisement proposal was displayed

on the outside of a COLTS bus in October or November of 2014. (Doc. 69, at 51).

COLTS has rejected other advertisements under the current policy including an

advertisement from Lutheran Home Healthcare and Hospice. (Doc. 71, at 63). In

addition to the NEPA Freethought Society advertisements, COLTS

also rejected an advertisement from "Wilkes Barre-Scranton Night Out" under the

current policy. (Doc. 71, at 67).

Despite using a minimalistic ad, there was still a back and forth argument about

the advertisement and discussion on-line. (T.T. at 30-31).  The discussion ultimately

evolved into whether or not God existed.  (T.T. at 31).  There was debate on the

Scranton Times website in the comments section of an article written regarding

COLTS' rejection of the NEPA Freethought Society's advertisement. (Doc. 71, at

64). There were several other bloggers and websites which posted articles about

COLTS' rejection of the NEPA Freethought Society's advertisement, all of which

contained back and forth debate about the issue. (Doc. 71, at 65).  Mr. Vacula agreed

that as a result of COLTS rejecting the NEPA Freethought Society's advertisement, a

discussion occurred about the existence or nonexistence of God. (Doc. 71, at 66; T.T.

at 31-32).

Justin Vacula admitted that it is possible that the NEPA Freethought Society's

Advertisement would be offensive to some people.  (T.T. at 39). Mr. Vacula has

never complained to COLTS about an advertisement which was run on COLTS bus.

(T.T. at 42). There has never been an ad run on a COLTS bus which discussed the existence of non existence of God.  (T.T. at 93).

According to COLTS' solicitor, they did not feel that advertising space was an appropriate forum for the dissemination and debate and discussion of public issues. (T.T. at 119). COLTS intent was to stay out of the religious business.  (T.T. at 120). Mr. Hinton was contacted by the ACLU to discuss the policy. (T.T. at 121).  The ACLU felt that it was too discretionary. (T.T. 122). There were also discussions about making the policy commercial only.  (T.T. at 122).

The buses are confined spaces and COLTS does not want heated debate, arguing or anything that would cause disruption.  (T.T. at 69).  In researching the policy, it was noted that there were controversies throughout the country over advertisements on buses related to God.  (T.T. at 95, 123; Exhibit 68). These were a concern for COLTS when discussing its advertising policy.  (T.T. at  96).  There was a concern that it would affect revenue at COLTS because once they opened the door to religion, they would be opening their buses up to more hard hitting religious advertisements.  (T.T. at 123). COLTS wanted to stay out of the religion business, which is evidenced by the rejection of the Lutheran and atheist advertisements pursuant to the policy.  (T.T. at 124). COLTS was also concerned it would be a safety issue on buses because there can be arguments that get started, which could distract passengers and drivers.  (T.T. at 97, 124-125).   COLTS was concerned that this would affect their revenue.  (T.T. at 97, 125).

## PROPOSED CONCLUSIONS OF LAW

**A.    COLTS' advertising spaces are a nonpublic forum**

The facts fail to establish that COLTS created a designated public forum.  A party creates a designated public forum when it intentionally designates property that traditionally has not been regarded as a public forum for use as a public forum. Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of Law v. Martinez, 130 S.Ct. 2971 (2010). The question is whether COLTS has created a designated public forum by "expressly" dedicating its advertising space to "speech activity." U.S. v. Kokinda, 497 U.S. 720, 726-727, 111 L. Ed. 2d 571 (1990) (plurality opinion).

To gauge COLTS' intent, the Court must examine its policies and practices in using the space, the nature of the property, and its compatibility with expressive activity. Gregoire v. Centennial Sch. Dist., 907 F.2d 1366, 1371 (3d Cir. 1990). Courts must rely on several factors to gauge the government's intent. Cornelius, 473 U.S. at 802. They look first to the terms of any policy the government has adopted to govern access to the forum. Id. If the government requires speakers seeking access to obtain permission, under pre-established guidelines that impose speaker-based or subject-matter limitations, the government generally intends to create a limited, rather than a designated, public forum. Forbes, 523 U.S. at 679-80; Cornelius, 473 U.S. at 804; Perry, 460 U.S. at 47. Granting selective access in that fashion negates any suggestion that the government intends to open its property to the "indiscriminate use

by all or part of the general public" necessary to create a designated public forum. Hills v. Scottsdale Unified Sch. Dist., 329 F.3d 1044, 1050 (9th Cir. 2003).

COLTS' policy provides that "it is COLTS' declared intent not to allow its transit vehicles or property to become a public forum for dissemination, debate or discussion of public issues."  There is no evidence to establish that COLTS has ever opened its advertising space to create anything other than a non-public forum.  Prior to the enactment of COLTS first advertising policy on June 21, 2011, COLTS rejected an advertisement regarding judgment day because it was religious in nature. After the adoption of the policy in 2011, COLTS continued to reject advertisements, including advertisements from Northeast Firearms, Wilkes Barre-Scranton Night Out, and the NEPA Freethought Society.  At no time since the enactment of the original advertising policy in June, 2011 has COLTS accepted any ads on its buses which were pro-religion or anti-religion.

A new policy was enacted on September 17, 2013. This was created to clarify the old policy and incorporate changes suggested by Plaintiff's counsel in this matter. Since the enactment of the new policy in 2013, no advertisements have been run which violate the policy.  The evidence in this matter fails to establish that COLTS intended to create anything but a non public forum, open only to certain kinds of expression. To the extent Plaintiff argues that advertisements which were posted prior to the enactment of the policy in 2011 somehow preclude COLTS from enacting the policy, both Christ's Bride Ministries, Inc. v. Southeastern Pennsylvania

10

Transportation Authority, 148 F.3d 242 (3d. Cir 1998) and Pittsburgh League of Young Voters Educ. Fund, 653 F.3d 290, 296 (3d Cir. 2011), stand for the proposition that past practice regarding advertising is not alone sufficient to establish that an advertising space is a designated public forum.  Furthermore, both cases concluded that if a forum was a designated public forum prior to adopting a new policy, a government entity is permitted to close such a forum. Therefore, to the extent Plaintiff argues that the buses were a designated public forum before the enactment of COLTS' policy, the forum was closed by COLTS enactment of a policy in 2011 and again in 2013. The uncontroverted evidence is that COLTS advertising space has been a non public forum.  Furthermore, it is uncontroverted that it has been a non public forum since June 21, 2011, which predates the Plaintiff's first submission of an advertisement.  As such, the COLTS advertising spaces must be treated as a nonpublic or limited public forum.

**ii.     The restrictions placed upon COLTS advertising space are viewpoint-neutral and reasonable in light of the purpose served by the forum**

In a limited public forum "content-based restraints are permitted, so long as they are designed to confine the forum to the limited and legitimate purposes for which it was created." Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 280 (3d Cir. 2004).  The government may not "regulat[e] speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." Rosenberger v. Rector and Visitors of the Univ. of Va., 515 U.S. 819,

11

829, 115 S.Ct. 2510, 2516 (1995). The government, however, may restrict the time,

place and manner of speech, as long as those restrictions are reasonable and serve the

purpose for which the government created the limited public forum. Pleasant Grove,

129 S.Ct. at 1132. *See also*, Lehman v. City of Shaker Heights, 418 U.S. 298, 41 L.

Ed. 2d 770, 94 S. Ct. 2714 (1974).

The evidence in this matter establishes that the restrictions of the COLTS'

policy are both content-neutral and reasonable in light of the forum.  COLTS has

never accepted advertisements "that promote the existence or non existence of a

supreme deity, deities, being or beings; that address, promote, criticize or attack a

religion or religious beliefs or lack of religious beliefs."  It was also COLTS' intent

not to make their property a public forum for the dissemination, debate, or discussion

of public issues or issues that are political or religious in nature.

This is clearly not a viewpoint restriction.  A viewpoint restriction "targets not

subject matter, but particular views taken by speakers on a subject." Rosenberger v.

Rector & Visitors of Univ. of Va., 515 U.S. 819, 829 (1995). The government must

abstain from regulating speech when the specific motivating ideology or the opinion

or perspective of the speaker is the rationale for the restriction. *See* Perry Ed. Assn. v.

Perry Local Educators' Assn., 460 U.S. 37, 46 (1983). COLTS policy placed no such

restrictions on speech.

The restriction is also reasonable.  It must be "reasonable in light of the

purpose served by the forum." Cornelius, 473 U.S. at 806. This requirement focuses

on whether the exclusion is consistent with "limiting [the] forum to activities compatible with the intended purpose of the property." <u>Perry</u>, 460 U.S. at 49. It is COLTS' intent to not allow its property to become a forum for debate on political or religious issues.  It is also their goal to "a safe and welcoming environment on its buses for the public at large."  Any speech that will foreseeably result in harm to, disruption of, or interference with the transportation system is, by definition, incompatible with the buses' intended purpose. *See* <u>Children of the Rosary v. City of Phoenix</u>, 154 F.3d 972, 979 (9th Cir. 1998); <u>United States v. Kokinda</u>, 497 U.S. 720, 732—33, 110 S. Ct. 3115 (1990) (plurality opinion); <u>Perry</u>, 460 U.S. at 51-52 & n.12. The "government's asserted interest in drawing content-based distinctions must be calis, but it does not have to be compelling."  *Id*.  COLTS can carry its burden in two ways, "record evidence or commonsense inferences."  *Id*.  COLTS has a two step burden it can satisfy:

> First, given that reasonableness "must be assessed in the light of the purpose of the forum and all the surrounding circumstances," *Cornelius*, 473 U.S. at 809, the evidence or commonsense inferences must allow us to grasp the purpose to which the City has devoted the forum. See also *Greer v. Spock*, 424 U.S. 828, 836, 96 S. Ct. 1211, 47 L. Ed. 2d 505 (1976) ("The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.") (internal quotation marks omitted). And second, the evidence or commonsense inferences also must provide a way of tying the limitation on speech to the forum's purpose. The City need not prove that the banned speech would cause harm if permitted, but per ISKCON it must provide a legitimate explanation for the restriction.

13

Doc No. 53, at 33-34 (citing *NAACP*, 834 F.3d at 445).

COLTS' policy was created because they did not want their buses to become a forum for debate of public issues. COLTS' policy was enacted so that they could provide a safe and reliable public transportation system to the public at large. In researching the policy, it was noted that there were controversies throughout the country over advertisements on buses related to God. There was a concern that it would affect revenue at COLTS because once they opened the door to religion, they would be opening their buses up to more hard hitting religious advertisements. This would lead to the issues which took place in other transit authorities, including boycotts, vandalism and a war of words on the buses. This is evidence to support the need for the policy's limitations. It also provides for a commonsense inference that if COLTS permitted religious advertisements, it could experience issues similar to those in Forth Worth, Detroit and throughout the country. This inference is also supported by the fact that the subject advertisement, and its rejection, resulted in debate on the internet about the existence or non-existence of God. Based upon the evidence of the record, it is clear that the COLTS policy is both content-neutral and reasonable in light of the forum. As such, Judgment must be entered in their favor.

### iii.   Plaintiff has failed to produce any evidence to establish viewpoint discrimination

Viewpoint discrimination occurs when the government "targets not subject matter, but particular views taken by speakers on a subject." <u>Rosenberger v. Rector &</u>

Visitors of Univ. of Va., 515 U.S. 819, 829 (1995). *See also* Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 82 (1st Cir. 2004); *See also*, Pittsburgh League of Young Voters Educ. Fund, 653 F.3d 290, 296 (3d Cir. 2011).   The uncontroverted evidence of record establishes that COLTS rejected all advertisements which were religious in nature since the inception of their advertising policy.

The record evidence fails to establish any evidence that COLTS failed to enforce its policy in a content neutral manner. At no time since December, 2009 have advertisements been placed on COLTS' buses which discuss the existence or non-existence of a supreme deity. At no time since the enactment of the original advertising policy in June, 2011 has COLTS accepted any advertisements on its buses which were pro-religion or anti-religion. There is no evidence to establish that any religious group was permitted to display pro-religious advertisements, or were favored over the NEPA Freethought Society. The COLTS policy was enforced in a consistent and content neutral manner.  As such, COLTS is entitled to Judgment in its favor.

MARSHALL  DENNEHEY
WARNER COLEMAN & GOGGIN

By:_____
        William J. McPartland, Esquire
        Attorney I.D. No:  PA 94214
        P.O. Box 3118
        Scranton, PA  18505-3118
        (570) 496-4600

## CERTIFICATE OF SERVICE

I, William J. McPartland, Esquire, do hereby certify that a true and correct copy of Defendant's Post-Trial Proposed Findings of Fact and Conclusions of Law was served upon all parties by ECF on the 29th day of December, 2017 at the following addresses:

Mary Catherine Roper, Esquire
Molly Tack-Hooper, Esquire
American Civil Liberties Union of Pennsylvania
P.O. Box 60173
Philadelphia, PA  19102


Ben Wanger, Esquire
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA  19103-7286

MARSHALL  DENNEHEY
WARNER COLEMAN & GOGGIN

By:_____
William J. McPartland, Esquire
Attorney I.D. No:  PA 94214
P.O. Box 3118
Scranton, PA  18505-3118
(570) 496-4600