# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

NORTHEASTERN PENNSYLVANIA :
FREETHOUGHT SOCIETY,
                                      :     CIVIL ACTION NO. 3:15-833

            **Plaintiff**            :              (JUDGE MANNION)

            **v.**                   :

COUNTY OF LACKAWANNA                  :
TRANSIT SYSTEM,
                                      :
            **Defendant**
                                      :

## MEMORANDUM

The saying has been around since at least the 1800's:

"Never discuss religion or politics with those who hold opinions opposite to yours; they are subjects that heat in handling, until they burn your fingers; . . ."[1]

Even Linus van Pelt has acknowledged:

"There are three things I have learned never to discuss with people . . . religion, politics and the Great Pumpkin!"[2]

Certainly, topics such as religion and politics have been deemed controversial for ages, but can the government prohibit advertising about such topics in public transit advertising spaces without violating the First Amendment?

---

[1]15 February 1840, The Corsair, "The Letter Bag of the Great Western," pg. 775, col. 1.

[2]PEANUTS by Charles M. Schulz, October 25, 1961.

The First Amendment prohibits the government from "abridging the freedom of speech." U.S. CONST. AMEND. I. However, courts have differed on how that guarantee applies when private speech occurs on government property. Depending on the forum in which the speech occurs -- a traditional public forum, a designated forum, or a limited (or nonpublic) forum -- private speech is afforded different levels of protection. One particular area that has frustrated the courts is how to distinguish between designated and limited public forums. The Supreme Court has stated that whether the government has created a designated public forum depends on its intent, as evidenced by its "policy and practice" and the "nature of the [government] property and its compatibility with expressive activity." Cornelius v. NAACP Legal Defense & Ed. Fund, Inc., 473 U.S. 788, 801 (1985). The federal courts, however, have disagreed over the proper application of this direction, especially in the area of advertising in public transit spaces. The classification of a public transit advertising space will have a significant impact on the types of speech that large numbers of commuters are exposed to everyday. The instant action presents this court with an opportunity to weigh in on the following issues of law: (1) whether the defendant County of Lackawanna Transit Systems' ("COLTS") advertising space is a designated public or limited forum, and (2) whether COLTS was justified in this case in refusing to display Northeastern Pennsylvania Freethought Society's ("Freethought") atheist advertisements in its public transit advertising space.

Freethought filed the instant civil rights action pursuant to 42 U.S.C. §1983, alleging that COLTS' advertising policy on its buses violates Freethought's right to free speech. Specifically, Freethought alleges that COLTS' refusal to run advertisements containing the word "atheists" is an impermissible content and viewpoint-based restriction in violation of its First Amendment rights. Freethought seeks a declaration that COLTS' rejection of its advertisements violated the First Amendment and a declaration that COLTS' 2013 Policy continues to violate the First Amendment.[3] Freethought also seeks a permanent injunction prohibiting COLTS from enforcing its 2013 Policy. Finally, Freethought requests costs and attorney's fees under 42 U.S.C. §1988.

A one-day, non-jury trial was held on November 13, 2017 at which the court heard testimony and received evidence. Based upon the testimony, the evidence of record and the applicable law, the following constitutes the court's findings of fact and conclusions of law with respect to Freethought's claims. For the reasons set forth herein, the court finds that COLTS' advertising space is a limited forum and that COLTS did not violate Freethought's First Amendment free speech rights when it refused to display Freethought's advertisements containing the word "atheists" on COLTS' buses. Judgment

---

[3]As previously noted by this court, Freethought cannot seek declaratory relief for alleged past constitutional violations. See Blakeney v. Marsico, 340 Fed.Appx. 778, 780 (3d Cir. 2009).

will therefore be entered in favor of COLTS.

## I.    Findings of Fact

Freethought is an unincorporated association of atheists, agnostics, secularists and skeptics, with its principal office in Wilkes-Barre, Pennsylvania. Freethought engages in social, educational and activist activities, including building a supportive community for atheists, agnostics, secularists and skeptics; promoting critical thinking; and upholding the separation of church and state. Further, Freethought engages in debates over the existence or non-existence of God. A typical consequence of the appearance of Freethought at an event is the discussion of whether or not God exists.

Justin Vacula is a co-organizer and spokesperson for Freethought. Mr. Vacula testified that Freethought wants the government to remain neutral on matters of religion. However, Mr. Vacula has stated that, if the government gets involved with religious advertisements, then it should treat other viewpoints equally.

COLTS is a public transportation authority headquartered in Scranton, Pennsylvania. Robert Fiume has served as COLTS' Executive Director since June 2008. Mr. Fiume is responsible for overseeing the entire transportation system. He initially delegated responsibility for deciding whether to accept proposed advertisements to the Advertising Manager, Jim Smith, and later to

the Communications Director, Gretchen Wintermantel.

Ms. Wintermantel has served as COLTS' Communications Director since 2009. In that capacity, she is responsible for, among other things, increasing ridership and interpreting COLTS' advertising policies to determine whether to accept particular proposed advertisements. At times, Ms. Wintermantel consults with COLTS' management and solicitor to determine whether to accept or reject proposed advertisements. Ms. Wintermantel and Mr. Fiume each possess final policymaking authority with respect to COLTS' enforcement of its advertising policies.[4]

COLTS has leased advertising space on the inside and outside of its vehicles since at least 1993. In doing so, COLTS opened its advertising space to the public for the purpose of raising revenue, not to further any other organizational policy or goal. Traditionally, advertising revenue has comprised less than 2% of COLTS' yearly revenue.

When it initially opened its advertising space, COLTS did not have any advertising policy restricting the types of advertisements it would run. Dating back to at least 2003, COLTS ran many religious and political advertisements, as well as advertisements for newspapers, educational institutions and beer distributors. During this time, COLTS did not receive any complaints about any advertisement that ran on a COLTS bus, nor was COLTS aware of any

---

[4]Both Ms. Wintermantel and Mr. Fiume were designated to testify on behalf of COLTS pursuant to Fed.R.Civ.P. 30(b)(6).

disruption on its buses caused by the advertisements it displayed.

It was not until May 2011 that COLTS finally rejected an advertisement proposal. On that occasion, Mr. Smith received a phone call from a local man who wanted to run an advertisement on a COLTS bus that said "Judgment Day is Coming in May." Mr. Smith informed Ms. Wintermantel about the proposed advertisement. Both Mr. Smith and Ms. Wintermantel were alarmed by the proposed "Judgment Day" advertisement due to its apparent religious nature. Ms. Wintermantel reviewed the website affiliated with the advertiser's campaign and confirmed that it was, in fact, religious. Mr. Smith and Ms. Wintermantel consulted with Mr. Fiume and decided that the "Judgment Day" advertisement could be controversial due to its religious nature. They agreed to not display the proposed advertisement, reasoning that religious advertisements can cause heated debates and arguments and that COLTS did not want such debates or arguments to occur inside the buses. The concern of COLTS was that buses are confined spaces and, for the safety of passengers and drivers, they did not want heated debates, arguments or anything else that could cause disruption on their buses. COLTS informed the potential customer that it would not run the "Judgment Day" advertisement.

In response to the proposed "Judgment Day" advertisement, Ms. Wintermantel determined that COLTS should set forth an advertising policy defining/clarifying the types of advertisements COLTS would and would not display. She drafted COLTS' first formal advertising policy (the "2011 Policy"),

6

which was reviewed by COLTS' solicitor and later approved by the COLTS Board of Directors on June 21, 2011. In developing the 2011 Policy, COLTS considered issues occurring at transit agencies in other cities throughout the country, including New York, Fort Worth, Detroit, Philadelphia, Washington, Chicago, Houston, New Orleans, Seattle and St. Louis. These issues included the boycotting of buses, vandalism of buses and the occurrence of "a war of words" on buses over controversial public issue advertisements, including the existence or non-existence of God. COLTS officials were concerned that, if they continued to allow such controversial advertisements on public issues on their buses, they would become a place that could make riders feel unwelcome. They also believed such advertisements could compromise riders' safety or cause vandalism of buses. Mr. Fiume testified that debate is a problem on buses because buses are small, confined areas in which COLTS must preserve the safety of passengers and drivers. While unrelated to advertisements, Mr. Fiume testified that past incidents on the buses involved people arguing, which led to the driver becoming distracted and needing to intervene. Mr. Fiume further indicated that debates and arguments occurring on the buses due to controversial advertisements could affect ridership.

The 2011 Policy provided that:

"COLTS will **not** accept advertising:

- for tobacco products, alcohol, and political candidates

- that is deemed in COLTs [sic] sole discretion to be derogatory to any race, color, gender, religion, ethnic background, age group, disability, marital or parental status, or sexual preference
- that promotes the use of firearms or firearm-related products
- that are obscene or pornographic
- that promotes violence or sexual conduct
- that are deemed defamatory, libelous or fraudulent based solely on the discretion of COLTS
- that are objectionable, controversial or would generally be offensive to COLTS' ridership based solely on the discretion of COLTS"

The 2011 Policy further provided that "it is COLTS' declared intent **not** to allow its transit vehicles or property to become a public forum for dissemination, debate, or discussion of public issues."

The parties have stipulated that the 2011 Policy was not designed to increase COLTS' ridership, nor was it prompted by any revenue-related goals or concerns. The 2011 Policy had no effect on COLTS' ridership and "was specifically to prevent debate inside of COLTS' buses . . . and had nothing to do with debate outside the buses."

While the 2011 Policy was being drafted, COLTS was approached by Northeast Firearms to run an advertisement for their business. Although the 2011 Policy was not yet in effect, the 2011 Policy was going to contain a restriction on any advertisements having to do with firearms, so COLTS did not accept the advertisement for Northeast Firearms.

At the time when the 2011 Policy was enacted, COLTS was running an advertisement for a beer distributor called "Brewer's Outlet." Despite the 2011

8

Policy's ban on advertisements for alcohol, COLTS continued to run the advertisements for Brewer's Outlet until its contract expired. Brewer's Outlet was informed that COLTS would not renew its advertising contract.

After the 2011 Policy was put in place, COLTS ran an advertisement for the annual Halloween party of Patrick O'Malley, Lackawanna County Commissioner. The advertisement, however, did not identify Mr. O'Malley as a County Commissioner, or in any political fashion, and did not contain any political statements.

In late 2011 or early 2012, Mr. Vacula noticed a scrolling message that said, "GOD BLESS AMERICA" on the electric head sign on a COLTS bus. After seeing this message, Mr. Vacula called COLTS to complain, and the message was taken down. Mr. Vacula later saw a "God Bless America" ribbon or magnet attached to the inside of a COLTS bus by the driver. Again, Mr. Vacula complained, and it was removed. Neither the scrolling message nor the ribbon/magnet was an advertisement, and each was placed by the individual driver, not at the behest of COLTS. However, Mr. Vacula saw the signs as promoting a religious message, and he felt that COLTS, as a government entity, should not be promoting such a message.

On January 30, 2012, Mr. Vacula sent an e-mail to Mr. Smith on behalf of Freethought, seeking to display an advertisement on a COLTS bus that contained an image of clouds and the word "Atheists" in large font above the URL address of the NEPA Freethought Society's webpage

9

(www.nepafreethought.org) in smaller font. Although he was not aware of any "God Bless America" signs continuing to run on the buses, Mr. Vacula submitted the proposed advertisement in response to the "God Bless America" messages on the COLTS buses and, further, to recruit potential new members to Freethought. Mr. Vacula expressed his intent to challenge the COLTS advertising policy, although the "God Bless America" signs were not part of any advertisement, and he testified that he had no challenge to any advertisements that were run on COLTS buses. Mr. Smith showed Mr. Vacula's e-mail to Ms. Wintermantel. COLTS rejected Freethought's proposed advertisement under the 2011 Policy based on its belief that the word "atheists" would likely cause passengers to engage in debates about atheism aboard COLTS' buses. COLTS believed that the words "atheist," "agnostics," "Catholic," "Jews," "Muslims," or "Hindu" -- or any word referring to a religion or lack of religion -- "could spark debate on a bus" and could "be a controversial issue," regardless of the context in which the word was used. COLTS also believed that such controversial messages could make riders feel uncomfortable. Mr. Vacula himself testified that the advertisement containing the word "atheists" could be offensive to some people. A few days after COLTS received Freethought's proposed advertisement, Mr. Smith telephoned Mr. Vacula to inform him that COLTS would not run the advertisement.

After the rejection of Freethought's advertisement, articles were run in

the Scranton Times-Tribune newspaper, which discussed the advertisement's rejection. In response to these articles, various comments were posted online that personally attacked Mr. Vacula and led to a controversial discussion between those who supported the advertisement and those who opposed it. In addition, there was discussion in the comments regarding the existence or non-existence of God.

In May 2012, COLTS rejected another advertisement proposal under the 2011 Policy for the "Wilkes-Barre Scranton Night Out" because the website contained links to establishments that served alcohol. Ms. Wintermantel, who made the decision to reject the advertisement, testified that COLTS would probably not reject the proposed advertisement if it were submitted again because, on its face, the advertisement did not violate the 2011 Policy.

On August 29, 2013, Freethought submitted a second advertisement for placement on COLTS buses. The proposed advertisement stated, "Atheists. NEPA Freethought Society. NEPAfreethought.org." On September 9, 2013, Ms. Wintermantel, writing on behalf of COLTS, sent a letter to Mr. Vacula, stating that COLTS would not display Freethought's proposed advertisement. In her letter, Ms. Wintermantel indicated that COLTS considered its property to be a nonpublic forum. Ms. Wintermantel further indicated that COLTS was rejecting Freethought's proposed advertisement based on COLTS' belief that the word "atheists" may offend or alienate a segment of its bus riders and

therefore negatively affect its revenue. Ms. Wintermantel expressed COLTS' goal of providing a safe and welcoming environment on its buses for the public at large, and she emphasized that the acceptance of public issue advertisements, such as those proposed by the plaintiff, in a confined space like the inside of a bus detracts from this goal.

On September 17, 2013, eight days after COLTS sent the letter to Mr. Vacula denying his second proposed advertisement, the COLTS Board of Directors enacted a new advertising policy (the "2013 Policy"), which was drafted by COLTS' solicitor, Mr. Hinton, after a discussion with the plaintiff's attorney. The 2013 Policy rescinded and replaced the 2011 Policy. The 2013 Policy was written to "clarify" the 2011 Policy as COLTS understood it and to more clearly "set forth the types of advertisements it will and will not accept[.]" The 2013 Policy, which is still in effect, provides that COLTS' leasing of advertising space is for "the sole purpose of generating revenue, while at the same time maintaining or increasing COLTS' ridership." Both Ms. Wintermantel and Mr. Hinton testified at trial that they were concerned that allowing controversial public issue advertisements on COLTS' buses would affect ridership and, as a result, revenue.[5] The 2013 Policy provides that:

---

[5]Freethought urges the court to reject any finding that COLTS' advertising policy was related to ridership or revenue. Indeed, Freethought has cited to portions of the record, which would seem to indicate that neither was the direct force behind the advertising policy. However, when one
(continued...)

"COLTS will **not** accept advertising:

- for tobacco or alcohol or for businesses that primarily traffic in such goods;
- that promotes the use of firearms or firearm-related products or for businesses that primarily traffic in such goods;
- that are obscene, pornographic, or promotes or depict sexually-oriented goods or services or for businesses that primarily traffic in such goods or services or that appeal to prurient interests;
- that promotes violence or sexual conduct;
- that are deemed defamatory, illegal, fraudulent, misleading or false;
- that proposes a transaction or activity that is prohibited by federal, state or local law;
- that exploit the likeness, picture, image or name of any person, and/or trademark, trade name, copyrighted materials or other intellectual property of a third party, without adequate proof of express written authorization to do so;
- that contain, employ or imply profane or vulgar words;
- that demean or disparage a person, group of persons, business or group of businesses;
- that, if permitted, could reasonably subject COLTS to civil

---

[5](...continued)

considers the record as a whole in this case, there is evidence that the advertising policy was related to ridership and revenue. To this extent, the record demonstrates that the advertising policy, at its core, was enacted to avoid controversy on the buses for the safety and comfort of passengers. This, in turn, was to maintain ridership and, as a result, revenue. In fact, although Ms. Wintermantel testified in her deposition that the advertising policy was not driven by revenue concerns, it was clear in her letter to Mr. Vacula denying his proposed advertisement, which was written prior to her deposition, that ridership and revenue were a concern. In her letter, Ms. Wintermantel expressed COLTS' goal of providing a safe and welcoming environment for its passengers and indicated that controversial advertisements, such as Freethought's proposed advertisement, could result in the alienation of riders and, in turn, negatively affect COLTS' revenue.

or criminal liability;

- that are political in nature or contain political messages, including advertisements involving political figures or candidates for public office, advertisements involving political parties or political affiliations, and/or advertisements involving an issue reasonably deemed by COLTS to be political in nature in that it directly or indirectly implicates the action, inaction, prospective action, or policies of a governmental entity;
- that promote the existence or non-existence of a supreme deity, deities, being or beings; that address, promote, criticize or attack a religion or religions, religious beliefs or lack of religious beliefs; that directly quote or cite scriptures, religious text or texts involving religious beliefs or lack of religious beliefs; or are otherwise religious in nature."

The 2013 Policy further states:

"It is COLTS' declared intent to maintain its advertising space on its property as a nonpublic forum and not to allow its transit vehicles or property to become a public forum for the dissemination, debate, or discussion of public issues or issues that are political or religious in nature."

The 2013 Policy was again enacted to prevent debates or arguments on COLTS buses because COLTS believes debates aboard buses could be dangerous and render the buses potentially unsafe for its passengers and drivers. Additionally, COLTS did not want to offend or alienate anyone who would see the advertisements. COLTS wanted to remain neutral on controversial issues. In creating the 2013 Policy, COLTS specifically sought to preclude issues that are political or religious in nature because COLTS believes these are topics that people feel strongly about.

On July 21, 2014, Freethought submitted a new advertisement proposal to COLTS that stated:

14

"Atheists.
NEPA Freethought Society
meetup.com/nepafreethoughtsociety"

That same day, COLTS sent Mr. Vacula a letter, again denying the proposed advertisement based upon the fact that it addressed the non-existence of a deity and that the word "atheists" on the advertisement would promote debate over a public issue, thus violating COLTS' 2013 advertising policy.

Again, that same day, Mr. Vacula submitted another proposed advertisement, which was identical to the advertisement proposal rejected earlier that day, except that it did not include the word "atheists." Rather, it read:

"NEPA Freethought Society
meetup.com/nepafreethoughtsociety"

On the following day, July 22, 2014, Ms. Wintermantel sent an e-mail to Mr. Vacula agreeing to run Freethought's proposed advertisement because the word "atheists" had been taken out and because, on its face, it did not violate COLTS' advertising policy. This final version of Freethought's advertisement ran on the outside of a COLTS bus in October or November of 2014. COLTS did not receive any complaints about Freethought's advertisement or any reports of passengers on COLTS' buses debating the advertisement.

COLTS has rejected other advertisements under the 2013 Policy, including an advertisement from Lutheran Home Healthcare and Hospice. In

rejecting the advertisement, COLTS' solicitor noted the word "Lutheran," along with a cross, in the advertisement. The solicitor recommended that the advertisement be rejected to facilitate consistent enforcement of the advertising policy. This way, COLTS would not be allowing an advertisement containing religious connotations while disallowing Freethought's advertisement.

The testimony of COLTS' solicitor was that both the 2011 Policy and the 2013 Policy were meant to keep COLTS out of the religion business. It was believed that once COLTS opened the door to religion, they would be opening themselves up to other more hard-hitting religious advertisements, which could cause disruptions and disturbances on the buses. COLTS took note that there were, in fact, controversies occurring in other cities throughout the country over advertisements on buses related to religion and other controversial matters, which led to the boycotting and vandalism of buses, as well as a "war of words" on the buses.[6]

---

[6]Freethought urges the court to afford Solicitor Hinton's testimony no weight because the Fed.R.Civ.P. 30(b)(6) deposition testimony was taken from Ms. Wintermantel and Mr. Fiume on the topics that Mr. Hinton addressed in his trial testimony. Freethought argues that COLTS is bound by the testimony of its 30(b)(6) designees and therefore cannot present any evidence differing from that of its designees.

Initially, the court does not find Mr. Hinton's testimony to be inconsistent with that of Ms. Wintermantel or Mr. Fiume. Moreover, "the testimony of a Rule 30(b)(6) representative, although admissible against the party that
(continued...)

## II.    Conclusions of Law

"The Supreme Court has outlined a three-step analysis regarding a prima facie case of alleged First Amendment violations." Am. Freedom Defense Initiative v. SEPTA, 92 F.Supp.3d 314, 322 (E.D.Pa. 2015) (citing Cornelius v. NAACP Legal Def. & Educ. Fund, 473 U.S. 788 (1985)). First, the court must "determine whether the advertisement in question constitutes speech protected by the First Amendment." Second, the court must determine "the nature of the forum created by [COLTS'] advertising space" "because the appropriate level of scrutiny depends on the categorization of the forum." Id. Third, the court must examine "whether the anti-disparagement standard at issue survives the applicable level of scrutiny." Id.

This court decided on summary judgment, and the parties have not

---

[6](...continued)
designates the representative, is not a judicial admission absolutely binding on that party." 250 F.R.D. at 212 (quoting Charles A. Wright et al., 8A Federal Practice and Procedure §2103 (Supp. 2007)) (further citations omitted). Rather, "testimony given at a Rule 30(b)(6) deposition is evidence which, like any other deposition testimony, can be contradicted and used for impeachment purposes." Ozburn-Hessey Logistics, LLC v. 721 Logistics, LLC, 40 F.Supp.3d 437, 451 (E.D. Pa. 2014) (citing A.I. Credit Corp. v. Legion Ins. Co., 265 F.3d 630, 637 (7th Cir. 2001) (quoting Indus. Hard Chrome, Ltd. v. Hetran, Inc., 92 F.Supp.2d 786, 791 (N.D.Ill. 2000)); accord R & B Appliance Parts, Inc. v. Amana Co., L.P., 258 F.3d 783, 786 (8th Cir. 2001). As such, the court will consider the trial testimony of COLTS' solicitor, Mr. Hinton.

disputed, that the plaintiff's advertisements are speech protected by the First Amendment. The issue then becomes "the nature of the forum created by [COLTS'] advertising space." Id. at 323.

Freethought argues that COLTS' advertising space[7] is a designated public forum[8], while COLTS argues that its advertising space is a limited or nonpublic forum[9]. At summary judgment, the court determined on the

---

[7]The court determined at summary judgment that the relevant forum is COLTS' advertising space on its buses, as opposed to all of COLTS' property, since this is the specific public property that plaintiff is seeking to access. See Cornelius, 473 U.S. at 801. The parties have not challenged this determination.

[8]"A designated public forum is public property 'that has not traditionally been regarded as a public forum' but that the government has intentionally opened up for use by the public as a place for expressive activity." Am. Freedom Defense Initiative, 92 F.Supp.3d at 323 (citing Pittsburgh League of Young Voters Educ. Fund v. Port Auth., 653 F.3d 290, 296 (3d Cir. 2011)); see also Pleasant Grove City v. Summum, 555 U.S. 460 (2009); Christ's Bride Ministries v. Se. Pa. Transp. Auth., 148 F.3d 242, 248 (3d Cir. 1998) (the court asks whether the government "clearly and deliberately opened its advertising space to the public."). In designated public fora, "content-based restrictions are subject to strict scrutiny." Pittsburgh League of Young Voters Educ. Fund, 653 F.3d at 296) (citing Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983)).

[9]The Third Circuit has noted that the terms limited forum and nonpublic forum are interchangeable and that these categories of forum are the same. See NAACP v. City of Phila., 834 F.3d 435, 441 n.2 (3d Cir. 2016). The court will use the term limited forum herein.

A limited forum consists of "public property that 'is not by tradition or designation a forum for public communication . . .'" Pittsburgh League of Young Voters Educ. Fund, 653 F.3d at 296 (citing Perry, 460 U.S. at 46).
(continued...)

18

undisputed factual record that COLTS' advertising space is a limited forum. Nothing in the evidence presented at trial alters the court's determination of the forum.

A determination as to whether COLTS' advertising space is a designated public forum or a limited forum requires the court to engage in a fact-specific analysis of the forum itself. Christ's Bride Ministries, 148 F.3d at 248-52. In Am. Freedom Defense Initiative, 92 F.Supp.3d at 324, the court explained:

> In conducting the forum analysis, courts "look to [COLTS'] intent with regard to the forum in question and ask whether [COLTS] clearly and deliberately opened its advertising space to the public." Christ's Bride Ministries, 148 F.3d at 248-49. "[COLTS'] own statement of its intent, however, does not resolve the public forum question." Id. at 251. Rather, intent is gauged by examining [COLTS'] "policies and practices in using the space and also the nature of the property and its compatibility with expressive activity." Id. at 249. Restrictions on the use of the forum "do not necessarily mean that [COLTS] has not created a public forum. They may demonstrate instead that [COLTS] intended to create a limited public forum, open only to certain kinds of expression." Id.

Transit facilities that have combined written policies with practices that demonstrate an intent to limit a forum will generally avoid being found to have created a designated public forum. See Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65 (1st Cir. 2004).

---

[9](...continued)
"Access to a [limited] forum can be restricted so long as the restrictions are reasonable and viewpoint neutral." Id. (citing Cornelius, 473 U.S. at 800).

To gauge COLTS' intent, the court looks to the terms of any policy COLTS has enacted to govern access to the forum. Cornelius, 473 U.S. at 802. Moreover, if COLTS requires potential advertisers to obtain permission, under pre-established guidelines that impose speaker-based or subject-matter limitations, it will generally be found that COLTS intended to create a limited, rather than designated, public forum. Arkansas Educ. Television Com'n v. Forbes, 523 U.S. 666, 679-80 (1998); Cornelius, 473 U.S. at 804; Perry, 460 U.S. at 47.

The evidence in this case shows that COLTS initially opened its advertising space on buses for sale to the general public for the purpose of raising revenue. Up until May 2011, just before the passage of the 2011 Policy, COLTS did not reject any advertisement proposal and accepted a wide array of political and religious advertisements. While this may very well have rendered COLTS' advertising space a designated public forum at the time, in June 2011, COLTS adopted its first advertising policy. The 2011 Policy specifically declared COLTS' intent "not to allow its transit vehicles or property to become a public forum for dissemination, debate, or discussion of public issues." According to the record, the 2011 Policy was drafted and implemented to prevent controversy and public debate on its buses. The evidence in the record indicates that the intent in implementing the policy was not to avoid debate simply to avoid debate, but to avoid debate for the safety and comfort of COLTS' passengers, who are essentially a captive audience,

as well as for the safety of COLTS' drivers. At the time when the 2011 Policy was drafted, officials at COLTS were taking note of issues occurring at transit authorities in other cities throughout the country, including the boycotting and vandalism of buses that displayed controversial advertisements, as well as a "war of words" occurring on the buses over controversial issues. In taking these matters into consideration, COLTS' 2011 Policy restricted a number of topics for advertisements that could be deemed controversial. Among these were religious advertisements.

In 2012, after a discussion with the plaintiff's attorney, COLTS began revising its 2011 Policy to make more clear the types of advertisements it would and would not accept and to alleviate the "catch all" discretionary clause in the 2011 Policy, which would limit COLTS' discretion in which advertisements it would or would not display. The 2013 Policy rescinded and replaced the 2011 Policy, rendering the 2011 Policy a nullity. Again, the 2013 Policy declared COLTS' intent "to maintain its advertising space on its property as a nonpublic forum and not to allow its transit vehicles or property to become a public forum for the dissemination, debate, or discussion of public issues or issues that are political or religious in nature." The 2013 Policy contained a number of restrictions on public issue advertisements. Included among the specific restrictions in the 2013 Policy were religious advertisements "that promote the existence or non-existence of a supreme deity, deities, being or beings; that address, promote, criticize or attack a

21

religion or religions, religious beliefs or lack of religious belief; that directly quote or cite scriptures, religious text or texts involving religious beliefs or lack of religious beliefs; or are otherwise religious in nature." The 2013 Policy provides that the sale of advertising space was "for the sole purpose of generating revenue for COLTS while at the same time maintaining or increasing its ridership." Pursuant to the evidence, potential advertisers have to obtain permission from COLTS to access the space on its buses, and COLTS has a process to review all proposed advertisements demonstrating its intent to control access to its buses.

Concerning its practices, the evidence demonstrates that COLTS has applied its advertising policy in a consistent manner and that COLTS has attempted to maintain strict controls over the types of advertisements it has permitted on its buses since the enactment of its advertising policy. Enforcement of COLTS' policy prohibiting all controversial speech in advertisements has been consistent with its goals of excluding advertisements that would lead to debates and arguments on its buses and of transporting its riders safely to their destinations. The evidence demonstrates that COLTS did not allow the plaintiff's advertisement which contained the word "atheists" and also did not allow the Lutheran advertisement which depicted the cross. COLTS did not allow a proposed advertisement from Northeast Firearms in 2011 while it was drafting its initial policy, as that advertisement would have been in violation of the ban on

advertisements "that promotes the use of firearms or firearm-related products." Moreover, COLTS rejected an advertisement in May 2012 for the "Wilkes-Barre Scranton Night Out" since the website on the advertisement contained advertisements for establishments that serve alcohol.

In light of COLTS' written advertising policy, which declares its intent not to become a public forum, and which provides for the exclusion of very specific types of advertisements requiring a review process prior to the placement of an advertisement, and based on COLTS' practice of permitting only limited access to the advertising spaces on its buses, the court finds that COLTS' advertising space is not a designated public forum, regardless of how the forum previously could have been labeled.[10] See Cornelius, 473 U.S. at

---

[10]Even if COLTS' advertising space was previously a designated public forum, such a forum can be closed. See Seattle Mideast Awareness Campaign v. King County, 781 F.3d 489, 496 (9th Cir. 2015) (citing Perry, 460 U.S. at 45-46) ("The principal difference between traditional and designated public forums is that the government may close a designated forum whenever it chooses, but it may not close a traditional public forum to expressive activity altogether."). See also Sons of Confederate Veterans, Virginia Div. v. City of Lexington, Va., 894 F.Supp.2d 768, 773-74 (W.D.Va. 2012), aff'd, 722 F.3d 224 (4th Cir. 2013) (government "is not required to indefinitely retain the open character of the facility," and may indeed close the forum as it sees fit) (citations omitted); Satawa v. Macomb Cty. Rd. Comm'n, 689 F.3d 506, 517 (6th Cir. 2012) (government . . . need not indefinitely retain the open character of the facility); Santa Monica Food Not Bombs v. City of Santa Monica, 450 F.3d 1022, 1032 (9th Cir. 2006) (plaintiff's challenge to an ordinance was no longer viable because the defendant city had recently closed the public forum in which the plaintiffs sought to exercise First Amendment rights); Ridley, 390 F.3d at 77 ("The government is free to change the nature of any nontraditional (continued...)

805. COLTS' policy and practice show that the advertising space on its buses was not open and suitable for speech concerning public issues and the evidence shows that, after the enactment of its advertising policy, COLTS did not have a history of allowing such advertisements. Rather, the advertising space on COLTS' buses is a limited forum. This finding is consistent with Lehman v. City of Shaker Heights, 418 U.S. 298 (1974), in which the court stated:

> Here, we have no open spaces, no meeting hall, park, street corner, or other public thoroughfare. Instead, the city is engaged in commerce. It must provide rapid, convenient, pleasant, and inexpensive service to the commuters . . . The [advertising] space, although incidental to the provision of public transportation, is a part of the commercial venture . . . [A] city transit system has discretion to develop and make reasonable choices concerning the type of advertising that may be displayed in its vehicles.

Id. at 303.

In arguing that COLTS' advertising space is a designated public forum,

---

[10](...continued)
forum as it wishes."); Currier v. Potter, 379 F.3d 716, 728 (9th Cir. 2004) (government may close a designated public forum "whenever it wants"); Make the Road by Walking, Inc. v. Turner, 378 F.3d 133, 143 (2d Cir. 2004) ("Furthermore, the government may decide to close a designated public forum."); Shopco Distribution Co. v. Commanding Gen. of Marine Corps. Base, Camp Lejeune, N.C., 885 F.2d 167, 173 (4th Cir. 1989) ("Even assuming arguendo that the Commanding General did . . . change Camp Lejeune housing areas from non-public to public forums, he 'is not required to indefinitely retain the open character of the facilit[ies],'") (quotation omitted); U.S. v. Bjerke, 796 F.2d 643, 647 (3d Cir. 1986) ("[O]fficials may choose to close such a designated public forum at any time.")

Freethought provides that, even after the passage of the 2011 and 2013 Policies, COLTS ran non-commercial advertisements on issues of public concern, including the Diocese of Scranton's "Adoption for Life" advertisement that said "Choose Adoption . . . It Works!," an advertisement for "National Infant Immunization Week," and annual advertisements for a free children's Halloween party hosted by Patrick O'Malley, a Lackawanna County Commissioner, all of which Freethought believes demonstrate inconsistencies in the application of the advertising policy. As to these advertisements, the adoption advertisement did not contain any religious references or any references to the Diocese of Scranton and, as such, was neutral on its face. The O'Malley Halloween advertisement did not reference Mr. O'Malley's political office or his candidacy, so it was also neutral on its face. Finally, COLTS admittedly ran the immunization advertisement without a clear understanding of the controversial nature of the subject matter at the time, but COLTS indicated that, currently, the advertisement would not be displayed. This single advertisement does not demonstrate that COLTS opened its advertising space for all intents and purposes to the public, so as to render the advertising space a designated public forum.

The plaintiff also argues that COLTS continued to run the commercial advertisement for "Brewer's Outlet" after the 2011 Policy was enacted, despite its ban on alcohol related advertisements. The record demonstrates that COLTS had a pre-existing contract with Brewer's Outlet and continued to run

this advertisement until the contract with Brewer's Outlet expired in April 2012. As there was an existing contract in place at the time the 2011 Policy was enacted, COLTS was justified in running the Brewer's Outlet advertisement to the conclusion of its contract, rather than facing a breach of contract claim. Brewer's Outlet was informed that the contract would not be renewed once it expired.

Having found that COLTS' advertising space is a limited forum, the court must now determine whether COLTS' advertising policy comports with the prescribed level of scrutiny applicable to a limited forum. A limited forum has "the least protection under the First Amendment." Perry, 460 U.S. at 46; NAACP, 834 F.3d at 441. As previously noted, restrictions on speech in a limited forum are allowed if they are reasonable and viewpoint neutral. Id. "[T]he 'Government's decision to restrict access . . . need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation.'" Id. (quoting Cornelius, 473 U.S. at 808) (emphasis in original). "Reasonableness is a case-specific inquiry." NAACP, 834 F.3d at 448. Reasonableness is assessed based on the purpose of the forum and based on all surrounding circumstances of a particular case. Cornelius, 473 U.S. at 808-09. "[A] restriction on speech in a [limited] forum is 'reasonable' when it is 'consistent with the [government's] legitimate interest in preserv[ing] the property . . . for the use to which it is lawfully dedicated.'" Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 687 (1992) (citing Perry, 460 U.S.

at 50-51). When analyzing the reasonableness of speech restrictions, courts may rely on "record evidence or commonsense inferences. First . . . the evidence or commonsense inferences must allow us to grasp the purpose to which the [government] has devoted the forum. And second, the evidence or commonsense inferences also must provide a way of tying the limitation on speech to the forum's purpose." NAACP, 834 F.3d at 445. COLTS need not prove that its restrictions are the only way to achieve its articulated goals, but it must provide at least "a legitimate explanation for the restriction." Id. Because it is the government that is restricting speech, even in a limited forum, the burden of establishing reasonableness is on the government. Id. at 443.

The record establishes in this case that COLTS initially opened its advertising space to the public for the purpose of raising revenue. COLTS' 2013 Policy now provides that the "leasing of advertising space is for the sole purpose of generating revenue, while at the same time maintaining or increasing COLTS' ridership." With this, COLTS has met the initial part of its burden, which is to establish that generating revenue, while maintaining or increasing ridership, is the purpose of the forum. The issue then is whether COLTS' ban on controversial public issue speech is reasonably connected to that purpose. Even if COLTS cannot produce record evidence to show that the ban is reasonably connected to the purpose of the advertising space, commonsense inferences can salvage the ban.

27

COLTS has provided testimony that the advertising policy was enacted to keep COLTS neutral on matters of public concern. Moreover, COLTS was trying to restrict all public issue and controversial advertisements to avoid heated arguments and debates amongst riders on its buses. COLTS was concerned about potential dangerous situations on its buses which may result from heated debates. COLTS has stated that the purpose of its buses is to provide safe and reliable public transportation, as well as to provide a welcoming environment for the public. COLTS was concerned about its passengers and also believed that heated debates of public issues in the confined spaces of its buses could deter passengers from riding. COLTS was concerned that its failure to provide for safe transportation for its passengers could lead to decreased ridership and, as a result, impact its revenue.

Initially, to the extent COLTS has provided that the advertising policy was enacted to keep COLTS neutral on matters of public concern, maintaining a position of neutrality on public issues such as politics and religion has been found to be an especially strong interest supporting the reasonableness in limiting speech. See Children of the Rosary, 154 F.3d at 979. See also Student Coalition for Peace v. Lower Merion School Dist. Bd. of School Directors, 776 F.2d 431, 437 (3d Cir. 1985) ("The desire to avoid potentially disruptive controversy and maintain the appearance of neutrality is sufficient justification for excluding speakers from a [limited] forum.") (internal quotation omitted). Freethought does not appear to take direct issue

with COLTS' neutrality stance and, in fact, Mr. Vacula testified that he wants the government to remain neutral on matters of religion.

As to COLTS' concern for decreased ridership, Freethought argues that COLTS has not produced evidence that shows allowing advertisements that may spark debate on buses causes any decrease in passengers. Along this line, Freethought argues that many of the advertisements banned by the 2013 Policy previously ran on COLTS buses and that "COLTS was unaware of any disruption on a COLTS bus caused by an [advertisement] or by debate among passengers."

As indicated earlier, COLTS does not have to show that the prohibited speech would actually cause harm if it was allowed, rather it only has to show by the evidence or by commonsense inferences that it could potentially affect its revenue or ridership. COLTS has presented evidence that, at the time they were drafting their advertising policy, they were aware of incidents occurring in a number of cities throughout the country. These incidents involved the boycotting of bus companies, vandalism of buses, and the initiation of "a war of words" on buses over advertisements containing controversial issues, including the existence or non-existence of God. Given the decrease in civil tolerance and the increase in social unrest and violence in today's society, and even dating back to the time of the implementation of COLTS' policies, COLTS had a reasonable basis for its advertising restrictions. COLTS was concerned that its continuation of such advertisements could subject them to

similar incidents, which could affect ridership and revenue. In fact, at the time Freethought's initial advertisement was declined and the matter was discussed in the local newspaper, various comments were posted that personally attacked Mr. Vacula and a controversial discussion ensued between those who supported the advertisement and those who opposed it. While Freethought dismisses this exchange because it did not take place in person inside a COLTS bus, it is not unreasonable to envision that such an exchange could occur on a COLTS bus and potentially lead to a dangerous situation for both passengers and drivers.

Furthermore, the 2013 Policy is related to COLTS' duty to provide safe transportation to its riders. Commonsense inferences dictate that, if COLTS can not provide safe transportation to its riders, they will lose riders and, consequently, revenue. The purpose of the advertising policy was to avoid heated debate or controversy on the buses, which could result in riders not taking the bus and, as a result, decrease ridership.

In light of the above, the court finds that COLTS' advertising policy restrictions are reasonable, as the reason for the restriction can be tied to the purpose of the forum. The determination then must be made whether the restriction is viewpoint neutral.[11]

---

[11]Freethought has also raised a viewpoint discrimination claim, which the court will consider since Freethought would be entitled to relief if it (continued...)

"A viewpoint restriction 'targets not subject matter, but particular views taken by speakers on a subject.'" Am. Freedom Defense Initiative, 92 F.Supp.3d at 324 (citing Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829 (1995)); Pittsburgh League of Young Voters Educ., 653 F.3d at 296. Thus, "if the government allows speech on a certain subject in any forum, it must accept all viewpoints on the subject, even those that it disfavors or finds unpopular." Id. (citing Pittsburgh League of Young Voters Educ., 653 F.3d at 296). "[I]n Cornelius the [Supreme] Court suggested that a restriction will be unconstitutional if it was 'impermissibly motivated by a desire to suppress a particular point of view.'" Id. (citing Cornelius, 473 U.S. at 812-13).

Freethought argues that COLTS' advertising policy is viewpoint discriminatory because it favors non-religious/non-atheist speakers over religious/atheist speakers. However, the court finds that the restriction on all speech related to religion is a content, not viewpoint, based restriction. In fact, Freethought itself elsewhere refers to the advertising policy in its materials as a content-based restriction.  The Supreme Court has stated:

> "[I]n determining whether the state is acting to preserve the limits of the forum it has created so that the exclusion of a class of

---

[11](...continued)
establishes this claim. With respect to plaintiff's viewpoint discrimination claim, it does not matter if the advertising space on COLTS' buses is a designated public forum or a nonpublic forum. Regardless of the designation, plaintiff will prevail in its case if it establishes its viewpoint discrimination claim. See Pittsburgh League of Young Voters Educ., 653 F.3d at 296.

speech is legitimate, we have observed a distinction between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations."

Rosenberger v. Rector Visitors of Univ. of Va., 515 U.S. at 829-30.

Here, COLTS is not targeting Freethought's particular views by way of its advertising policy. Instead, it is excluding the entire subject matter of religion from its advertising space. In fact, since the passage of COLTS' advertising policy, the record demonstrates that COLTS has not accepted any advertisements that are religious in nature or that appear to promote either the existence or the non-existence of God. Freethought's advertisements do not seek to address a general, but otherwise permissible, topic. The sole purpose of Freethought's advertisements was to challenge COLTS' advertising policy and to bring awareness to the atheist perspective to recruit members. Freethought has failed to establish that COLTS rejected its advertisements to suppress a point of view that Freethought sought to espouse on an otherwise includible subject. See Cornelius, 473 U.S. at 806. There is therefore no viewpoint based restriction. COLTS' content based restriction on promoting or opposing religion is neutral and reasonable.

Finally, Freethought argues that the 2013 Policy is unconstitutionally vague and allows COLTS too much discretion in what to allow or not allow in its advertising spaces. Simply because a policy requires some interpretation

does not render the policy vague. See McConnell v. FEC, 540 U.S. 93, n.64 (2003); Rose v. Locke, 423 U.S. 48, 49-50 (1975); Children of the Rosary, 154 F.3d at 983. A policy is vague where it does not adequately inform the public of what they can and cannot do. The constitutional test for vagueness is whether a person of ordinary intelligence can tell what conduct is permitted or proscribed. United Food & Commercial Workers Union, Local 1099 v. S.W. Ohio Reg'l Transit Auth., 163 F.3d 341, 358-59 (6th Cir. 1998). Upon a reading of COLTS' advertising policy, a person of ordinary intelligence can generally tell what types of advertisements are permitted or proscribed.

Moreover, COLTS revised their 2011 Policy and, in the 2013 Policy, took away COLTS' unfettered discretion to refuse advertisements. It is inevitable that there will be some degree of interpretation necessary where regulations are imposed. "[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." Minnesota Voters Alliance v. Mansky, ___ U.S. ___ (2018), 2018 WL 2973746, at 1891 (June 14, 2018) (citing Ward v. Rock Against Racism, 491 U.S. 781, 794 (1989)). It is an indeterminate prohibition that carries with it "[t]he opportunity for abuse, especially where [it] has received a virtually open-ended interpretation." Id. (citing Board of Airport Comm'rs of Los Angeles v. Jews for Jesus, 482 U.S. 569, 576 (1987)). No policy can be so specific as to cover every conceivable situation and to disallow all discretion or interpretation in its application. See Ridley, 390 F.3d at 95. Although COLTS' advertising

policy allows for limited leeway in its interpretation, it is not indeterminate. The court concludes, therefore, that COLTS' advertising policy is not unconstitutionally vague.

## III.  CONCLUSION

The legal issues presented in this case are particularly fact specific. By way of this decision, the court in no way diminishes the importance of free speech in our society. In fact, in today's society, free speech is more important than ever. That being said, the law dictates that, under the facts of this case alone, that COLTS' advertising space is a limited forum and that COLTS did not violate Freethought's First Amendment right to free speech by refusing to place its advertisement on COLTS' buses.

For the foregoing reasons, judgment will be entered in favor of COLTS and against Freethought. An appropriate order will issue.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Date:  July 9, 2018**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2015 MEMORANDA\15-833-03.wpd